**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SELMA DIVISION**

| | |
|---|---|
| **EQUAL EMPLOYMENT OPPORTUNITY COMMISSION** | ) ) ) |
| **Plaintiff,** | ) **Civil Action No.: 2:09-cv-0643-C** ) ) |
| **v.** | ) ) |
| **WINN DIXIE, INC. et al.,** | ) ) ) |
| **Defendant.** | ) |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO EXCLUDE PROPOSED
EXPERT TESTIMONY OF ROBERT M. LAJUENESSE
AND
MOTION TO EXCLUDE OR LIMIT THE REPORT
AND OPINION TESTIMONY OF DEFENDANT'S EXPERT DR. MARY BAKER**

The Equal Employment Opportunity Commission (the "EEOC," or the "Commission") in this single filing, for the reasons stated below, both responds to:

1)  Defendant Winn-Dixie Montgomery, LLC's Motion to Exclude Proposed Expert Testimony of Robert M. LaJuenesse (Doc. 73), and

2)  Moves the Court to exclude or limit the report and opinion testimony of Defendant's expert Dr. Mary Baker.

On September 29, 2009, the Commission filed this ADEA action, alleging that Clyde Bradberry was denied promotion to a Center Store Manager ("CSM") position by Defendant Winn-Dixie Montgomery, LLC ("Winn-Dixie") in 2007 because of his age. On July 1, 2010

1

Plaintiff filed a supplemental expert report by Dr. Robert LaJeunesse, a Commission staff economist, that covers two separate but related topics: first, a comparison of the age composition of Winn-Dixie's CSM's in District 36 where Bradberry was employed to that of all retail supervisors and managers employed by other firms in the same geographic area as the Company's District 36 and, second, Dr. LaJeunesse's estimate of the monetary relief needed to make Bradberry whole (Doc. 41).

On July 16, 2010, Defendant filed an expert report, prepared by economist Mary Baker entitled *Review and Critique of Dr. Robert LaJeunesse's Report* (Doc. 46-1)*,* in which Dr. Baker purported to simply review and evaluate the July 1, 2010 report of Dr. LaJeunesse.

On December 21, 2010, Defendant filed Defendant Winn-Dixie Montgomery, LLC's Motion to Exclude Proposed Expert Testimony of Robert M.  LaJeunesse (Doc. 73).  The motion attacks and seeks to exclude at the trial of this case Dr. LaJeunesse's testimony and opinions both as to Bradberry's damages and as to his statistical comparison.

Dr. LaJeunesse stands by his opinions as to damages, both back pay and front pay. However, the Commission has elected not to call Dr. LaJeunesse to testify or otherwise rely on the testimony or opinions of Dr. LaJeunesse concerning damages.  The Commission will proceed at trial to prove back pay without expert testimony.  If and when the jury returns a verdict in favor of the Commission, the Commission will seek from the Court the equitable relief of front pay, interest on the front pay award, and any other relief necessary to make Bradberry whole, again without reliance on expert testimony.[1]  This renders Defendant's Motion to Exclude

---

[1] It is well-settled that front pay is an equitable remedy to be decided by the court and not the jury. *See Pollard v. E.I. DuPont de Nemours,* 532 U.S. 843, 849, 854 (2001). *See also EEOC v. W & O, Inc.,* 213 F.3d 600, 618 (11th Cir. 2000); *Farley v. Nationwide Mutual Insurance Co.,* 197 F.3d 1322, 1338-39 (11th Cir. 1999); *Wilson v. S & L Acquisition, LP,* 940 F.2d 1429, 1438

Proposed Expert Testimony of Robert M. LaJeunesse moot insofar as it relates to Dr. LaJeunesse's testimony concerning damages.[2]

The Commission, however, does intend to call Dr. LaJeunesse at trial to testify concerning his statistical age comparison.  Defendant's Motion to Exclude Dr. LaJeunesse's testimony on that topic is, therefore, <u>not moot</u> and this Response will address Defendant's arguments as to that topic and will demonstrate why Dr. LaJeunesse's testimony is admissible and Defendant's Motion to Exclude that testimony is due to be denied.

Dr. Baker has also expressed opinions attacking Dr. LaJeunesse's statistical comparison and purporting to analyze Winn-Dixie's promotion selections for CSM positions in District 36. For the reasons that follow, the Commission moves the Court to exclude the proposed testimony of Dr. Baker.  Her report and proposed testimony violate Federal Rules of Evidence 401, 402, 403 and 702, and violate the legal standards for the admissibility of expert testimony expressed by the United States Supreme Court in the Expert Witness Trilogy ("Trilogy").[3]

## I.    STATEMENT OF THE CASE

Dr. Baker's report (Doc. 46-1), entitled *Review and Critique of Dr. Robert LaJeunesse's Report,* ("Report"), purports to analyze selections for CSM positions within Winn-Dixie's District 36 on the basis of employee age.[4] District 36 includes Store 543, in Selma, where the at-

---

(11th Cir. 1991). Interest on a back pay award, and the applicable rate of interest, are also matters for the Court to decide. *See EEOC v. Guardian Pools, Inc.,* 828 F.2d 1507, 1512 (11th Cir. 1987).

[2] It would also appear that the opinions of Defendant's expert Dr. Mary Baker, insofar as they relate to a review and critique of Dr. LaJeunesse's opinions on damages, would not be relevant at trial.

[3]*Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993); *General Electric Co. v. Joiner*, 522 U.S. 136 (1998); *Kumho Tire Co., Ltd., v. Carmichael,* 526 U.S. 137 (1999).

[4]Doc. 46-1, Appendix C.

3

issue promotion occurred in 2007. As explained below, Dr. Baker's report reflects invalid assumptions as well as inconsistent and inaccurate comparisons, all of which result in flawed statistical inferences. Her Tables 2, Appendix C and Appendix D, all contain errors that invalidate them as admissible *rebuttal* to Plaintiff expert's conclusion that the proportion of CSMs employed by Winn-Dixie on January 1, 2008 was significantly lower than the retail supervisory/manager workforce in the counties that comprise District 36.[5]

Defendant refused to provide the EEOC with any information concerning candidates for the at-issue jobs, particularly the number of individuals considered for such positions and either hired or rejected, on the basis of their age, until approximately one week <u>after</u> Dr. LaJeunesse's final report was filed and one week <u>before</u> Dr. Baker filed her report.[6] This discovery tactic effectively denied Dr. LaJeunesse the preferable option of performing an applicant flow analysis by age of those individuals who sought CSM positions.

His snapshot comparison of incumbent CSMs in District 36 on January 1, 2008[7] excludes the Inventory Control Managers, who were included in Dr. Baker's Appendix D table.[8] He thus followed the only methodology open to him that is consistent with long-established

---

[5]Doc. 41, p. 9.

[6]See the e-mail exchange between counsel submitted as a part of the Evidentiary Submission submitted in support of this Response and Motion.

[7]Doc. 41, 2.

[8]Doc. 46-1, Appendix D. Elsewhere in Dr. Baker's Report, Inventory Control Managers are not part of the comparison pool. See Doc. 46-1, Table 2.  She acknowledges that such individuals should be excluded, "because they do not supervise other employees" and, hence, fall clearly outside the data on Census occupational code 470, "First-line supervisors/managers of retail sales workers" which both parties' experts identify as the applicable external comparison. Doc. 46-1, footnote 42.

precedent that Title VII or ADEA applicant flow is preferable, but that in its absence external availability comparisons are permissible, so long as they reflect the relevant employment distributions on the basis of protected class status.[9]

Approximately a week after Dr. LaJeunesse submitted his final report, but not until then, did Defendant's counsel provide Dr. Baker and the EEOC with additional information on the candidates for CSM positions in District 36, including their ages. (Doc. 46-1, footnote 33). While disclaiming the "completeness and accuracy" of the information received by her, *Id.,* Dr. Baker nonetheless incorporated these data into her Report.

The consensus among scholars, commentators and the courts that properly crafted flow data is more probative than snapshot data in the analysis of employment discrimination derives, in large part, from the assumed accuracy of that data, which aggregates the series of decision events (such as, in this case, promotions) in question.[10]  That is why Dr. Baker's assumption that the reported number of applicants for CSM positions is accurate is especially unreliable. Her explanation: "I don't have any information to compare much of this to."(Baker Dep. 187). Translation: She accepts, at face value, the company's data, even while noting that ten of the CSM selections did not involve any candidates other than the selectee. (Doc. 46-1, footnote

---

[9]*Hazelwood School Dist. v. United States*, 433 U.S. 299, 308 n.13 (1977) ([If present] "applicant-flow data ... would be firmer proof."). *See also*, *EEOC v. Paramount Staffing, Inc*., 2010 WL 2521034, 109 F.E.P. Cases (BNA) 964 (W.D. Tenn., May 17, 2010)(2000 Census external availability data permissible to compare expected to actual employment levels where Defendant withheld and refused to provide applicant flow data); *Heller v. Shaw Industries, Inc.,* 167 F.3d 146, 160 (3rd Cir. 1999)(expert testimony cannot be excluded simply because the expert uses one test rather than another, when both tests are accepted in the field and both reach reliable results).

[10]Snapshot comparisons, in contrast, reflect various metrics: all of a company's employees in an at-interest category against an external benchmark that may, of necessity, not be a one hundred percent match.

33).[11]  Federal courts consistently hold that a basket of suspect practices - non-posted openings,

pre-selection favoritism, and unspecified, vague criteria - all contribute to a distortedly restricted

applicant flow and cast doubt on the reliability of any employer's reported practices.[12]

## II.        THE LEGAL STANDARD FOR ADMITTING EXPERT TESTIMONY

### A.        Supreme Court Precedent

Defendant's motion attacking the testimony of Dr. LaJeunesse is somewhat misleading

concerning the standard for admissibility of expert testimony under the Federal Rules of Civil

Procedure, and under *Daubert* and its progeny.  While the court's inquiry is "rigorous," the

Official Comments to the 2000 Amendments to Rule 702 state, "A review of the case law after

*Daubert* shows that the rejection of expert testimony is the exception rather than the rule." The

Comment goes on to say that "the trial court's role as gatekeeper is not intended to serve as a

replacement for the adversary system." Indeed, the Court in *Daubert stated*, "Vigorous cross-

examination, presentation of contrary evidence, and careful instruction on the burden of proof

are the traditional and appropriate means of attacking shaky but admissible evidence." 509 U.S.

579, 595 (1993). Rule 702 and *Daubert* were intended to liberalize, rather than restrict, the

standards for admissibility of expert testimony in federal courts. *KW Plastics v. United States*

*Can Co.,* 131 F. Supp.2d 1289, 1291 n.1 (M.D. Ala. 2001).

As the Court knows, it is not uncommon for two experts to reach different conclusions.

"Dueling experts" who interpret similar facts under differing assumptions are a staple of

_____

[11]See *Guinn v. Astra Zeneca Pharmaceuticals*, 602 F.3d 1245 (11th Cir. 2010), affirming
the exclusion of expert testimony that relied on records provided by counsel, and ignored other
factors that could affect the expert's opinion.

[12]*Markey v. Tenneco, Inc*., 707 F.2d 172, 174 (5th Cir. 1983) (proxy data useful when
actual applicant flow unavailable or rejected as tainted).

litigation.[13] Many of the criticisms raised by the Defendant are matters not of admissibility but affecting, at most, the weight the jury may give to the evidence.  Of course, it is the function of the jury to evaluate the testimony of an expert witness just as it evaluates the testimony of any other witness. *See Eleventh Circuit Pattern Jury Instructions (Civil) 2005,* No. 5.1, 5.2.

Trial courts have "broad latitude" in deciding whether to admit expert testimony. *Kumho Tire*, 526 U.S. at 142. The proponent of such witnesses has the burden, by a preponderance of the evidence, to show that they are qualified to testify and will offer opinions that are relevant under Evidence Rule 402, reliable under Evidence Rule 702, and will not, broadly understood, waste the jurors' or the Court's time under Evidence Rule 403. *In re Paoli R.R. Yard PBC Lit*., 35 F.3d 717, 744 (3d Cir. 1994).

The Trilogy, decided between 1993 and 1999 and then codified in the 2000 Amendments to Rule 702, articulates the process through which expert testimony is evaluated. Proposed opinions must be based on reliable scientific methods, reliably applied to the facts and data at hand. As gatekeeper, the district court must then determine whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute. *Daubert*, 509 U.S. at 591. This assessment process "applies to all expert testimony," including labor economists in the employment discrimination context. *Kumho Tire*, 526 U.S. at 147.

*Daubert* provided trial courts with a checklist of four factors to use in assessing expert reliability, 509 U.S. at 593-94, which have become known as the four "prongs" of a court's

---

[13] See, e.g., *Merisant Co. v. McNeil Nutritionals*, 2007 WL 707359 (E.D. Pa. 2007) (denying "dueling" *Daubert* motions where both experts' opinions are admissible).

gatekeeper evaluation. *Kumho Tire* further explained that these factors are neither exclusive nor dispositive, and that their application depends on the particular facts of each case. 526 U.S. at 150.

The inquiry must focus on an expert's principles and methodology rather than on the conclusions they generate, *Daubert*, 509 U.S. at 595, and must make certain that an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practices of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152. As such, a court may refuse to admit expert testimony if it concludes that "there is simply too great an analytical gap between the data and the proffered opinion." *Joiner*, 522 U.S. at 146.

Even where a witness is qualified to testify as an expert by virtue of education, training and/or experience, he or she may only offer opinions that (1) are based on sufficient facts or data, (2) are the product of reliable principles and methods, and (3) reasonably apply those principles to the facts at issue. *Kumho Tire*, 526 U.S. at 152-53. While the Trilogy did not eliminate the traditional means of attacking unsound expert testimony, such as cross-examination, oral argument and the opinion of opposing experts, *Daubert*, 509 U.S. at 596, and *Kumho Tire* make clear that there are limits at the intersection of evidence introduced through expert testimony and Rule 702 of the Federal Rules of Evidence, as those cases hold that a trial court, as the gatekeeper, should not tolerate expert opinions clearly exceeding and crossing that boundary. *Kumho Tire*, 526 U.S. at 157.

*Daubert* suggested, without requiring specific adherence to, a set of four factors to assist gatekeepers in this process, often referred to as the basic four prongs of the admissibility

checklist.[14] These original criteria are: (1) whether the theory supporting the expert's opinion has

been or can be tested or falsified; (2) whether the theory or technique has been cleared for

publication by peer review (or held up for professional scrutiny in the absence of any intent to

publish); (3) whether a technique has a known or potentially measurable rate of error; and (4)

whether the proposed approach or theory is generally accepted in that community of researchers

in which the expert is a recognized member.

Thus, even otherwise impeccable credentials do not permit an expert to jump to an

opinion that lacks factual support, or to subjects beyond the scope of her or his expertise.[15]

As noted in *Goebel v. Denver & Rio Grande W. R.R. Co*., 215 F.3d 1083, 1088 (10th Cir. 2000),

"It is axiomatic that an expert, no matter how good his credentials, is not permitted to speculate."

Other courts have added additional criteria, some of which were mentioned in the

Advisory Committee's Notes to the 2000 Amendments as also germane. These subsequent

factors include: (1) whether the expert's testimony stems from non-litigation research, rather

than being concocted solely for testimonial purposes;[16] (2) whether the expert has unjustifiably

extrapolated from an accepted premise to an unfounded conclusion, creating too great an

analytical gap between the data and the proffered opinion; (3) whether the expert has failed to

account for obvious alternative explanations beyond the one relied on; (4) whether the expert is

---

[14]509 U.S. at 593-94; *Kumho Tire*, 526 U.S. at 141.

[15]*Nimely v. City of New York*, 414 F.3d 381, 399 n.13 (2d Cir. 2005) expresses this point
succinctly: "[B]ecause a witness qualifies as an expert with respect to certain matters or areas of
knowledge, it by no means follows that he or she is qualified to express expert opinions in other
fields."

[16]See, for example, *Ambrosini v. Labarraque*, 101 F.3d 129, 139-40 (D.C. Cir. 1996)
*cert. dismissed, Upjohn, Inc. v. Ambrosini*, 520 U.S. 1205 (1997)( holding that the reliability of
an expert's testimony was reinforced by its consistency with his research on the same matter

being as careful as he or she would be in their regular professional work outside the realm of paid litigation consulting;[17] and (5)whether the expert's field of endeavor, itself, leads to reliable results, e.g., is not "junk science". Opinions meeting these criteria carry increased indicia of reliability, suggesting that valid protocols have been observed.

## B.    Eleventh Circuit and Other Appellate Precedent

The Evidence Trilogy is consistently interpreted by the courts of appeal below, including the Eleventh Circuit. Several cases are especially informative, as the expert admissibility questions addressed there are also present in this case. In particular, *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1317 (11th Cir. 1999), holds excludable any unreliable methodology, including tests that other scientists regard as misused or inappropriate. *Allison* also reiterates that the *Daubert* standard applies not just to Rule 702, but to Rules 401, 402 and 703 as well. 184 F.3d at 1309.

Similarly, *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1292-93 (11th Cir. 2005), noted that an expert's assumptions may be "facile" but still violate *Kumho Tire*'s "intellectual rigor" requirement,[18] as well as the "scientifically unsupported 'leap of faith' approach" condemned by *Daubert*, also citing *Allison*. Furthermore, Dr. Baker's assertion that Dr. LaJeunesse used the

_____

done ten years earlier).

[17]See *Fuesting v. Zimmer*, 421F.3d 528, 534-35 (7th Cir. 2005). If anything, even greater gatekeeper scrutiny is required when the expert's "regular professional work" is litigation consulting, which can mask the absence of intellectual rigor that may be present in an opinion shaped by its proponent's position.

[18]The "same level of intellectual rigor" standard reveals when pecuniary motive or advocacy bias signal tainted expert testimony. See *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 203 (4th Cir. 2000) (excluded physician expert admitted that his litigation-related evaluation was not consistent with his non-litigation approach in his own private practice). See also *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996) *cert. denied*, 519 U.S. 819 (1996), citing to *Daubert*'s observation that qualifications alone do not automatically require admissibility.

wrong Census data constitutes deliberate disregard of Census Bureau regulations.[19] See, e.g., U.S. Dept. of Commerce, Bureau of the Census, Revised Criteria for Census Bureau Public Use Data Products, 68 Fed.Reg. 23693 (2003).

Federal courts are in uniform agreement that expert opinion which is contrary to statutes or regulations is inadmissible. *See United States v. Cunningham*, 194 F.3d 1186, 1196 (11th Cir. 1999), upholding the exclusion of an expert who was unfamiliar with and misinterpreted the regulations applicable to that case. That precedent applies to Dr. Baker as well.[20]

### C.      Federal Rules of Evidence

#### 1.      Rules 401, 402 and 403

Article IV of the Federal Rules of Evidence covers the relevancy of evidence generally, and expert opinion in the specifics of this case. Rule 401 defines relevance, and Rule 402 admits relevant evidence and regards irrelevant evidence inadmissible, because it fails to satisfy Rule 401's definition in the first instance. Even if relevant, evidence can otherwise be excluded under Rule 403 if it is prejudicial, misleading, creates confusion regarding the issues being adjudicated, or wastes the jury's time.

One or more of the Rule 403 prongs are a sufficient basis to exclude, or to strike or limit,

---

[19]On one hand, Dr. Baker understands that Census EEO Special File tables cross-classifying occupation, geography and age were not created for counties having less than 100,000 inhabitants. (Baker Dep. 206: "It's not available.") On the other hand, her report denies that Dr. LaJeunesse's opinion is reliable because he assumes that the proportion of workers age forty and over in Dallas County (the site of Store 543 in Selma) can be treated as similar to nearby larger counties for which the information is available, adhering to acceptable expert practice. (Doc. 46-1, p. 19 and footnote 38).

[20]Dr. Baker's Table 2, (Doc 46-1, Table 2), uses 51.2 percent as the benchmark estimate of retail supervisors/managers age 40 and above, which is not far from the correct figure of 51.13 percent. The issue is not this de minimus miscalculation, but rather Dr. Baker's inconsistent adoption of a measure in her own analysis about which she objects when used by the opposing

portions of an expert's opinion that go beyond the limits of admissibility. This reflects the

gatekeeper's broad authority under the helpfulness standard, reflecting the core criterion for

allowing expert witnesses to testify in the first instance. In practice, courts often consider

exclusion on multiple grounds, often the combination of Rules 403 and 702. See, e.g., *United

States v. Posado*, 57 F.3d 428 (5th Cir. 1995) (admissibility inquiry based on Rules 402, 403 and

702; the 403 focus is on possible prejudice relative to the probative value of the expert's

testimony).[21]

### 2.    Rule 702

The amended version of Rule 702 enacted by Congress to codify the Trilogy and its

teachings in 2000 filled in whatever uncertainty lingered during the shift from pre- to post-

*Daubert* standards through the 1990s. Most importantly, the Advisory Committee's Note to the

2000 Amendments to Rule 702 explain the helpfulness standard underlying the Rule, stating,

"The expert's testimony must be grounded in an accepted body of learning or experience in the

expert's field, and the expert must explain how the conclusion is so grounded."

"Helpfulness" reflects the more formal language of Rule 702, namely that expert

testimony "will assist the trier of fact" by reliably applying sound scientific methodology to the

facts at issue. The scientific knowledge prong connotes more than "subjective belief or

---

expert.

[21]See, *Allison v. McGhan Medical Corp*., 184 F.3d 1300 (11th Cir. 1999) (exclusion based on Rules 401, 402, 702 and 703, and not just on 702). See, also, *Ram v. New Mexico Dept. of Environment*, 2006 WL 4079623 (D. N.M. 2006) (statistician excluded under Rules 403 and 702); *Mastercard Int'l., Inc. v. First National Bank of Omaha, Inc*., 2004 WL 326708 (S.D. N.Y. 2004) (excluding unreliable expert as prejudicial under Rule 403 as well as under Rules 402 and 702); *In re Rezulin Products Liability Lit*., 309 F.Supp.2d 531 (S.D. N.Y. 2004) (excludes proposed experts as unhelpful and encroaching); *Kay v. First Continental Trading, Inc*., 1997 WL 614394 (N.D. Ill. 1997) (lack of foundation and potential for jury prejudice under Rules 403 and 702).

unsupported speculation, *Daubert*, 509 U.S. at 590, and requires more than an expert's bald assertion in favor of the expressed opinion. *Joiner* repeated the inadmissibility of subjective speculation, 522 U.S. at 140, and further clarified *Daubert* to hold that *ipse dixit* rationales are impermissible. *Id.* at 146.

### III.    ARGUMENT

**A**.    **Dr. Baker's Critique of Dr. LaJeunesse's Statistical Comparison is So Technically Infirm That It is Inadmissible and Entitled to No Weight**

**1.   The Sum Total of Her Invalid Assumptions and Unreliable Analyses Constitute, in Addition to Its Parts, an Opinion That Should Not be Admitted**

Dr. Baker's report, both in its text and its tables, contain persistently inaccurate assumptions, methodology, calculations and conclusions. Individually, some are more glaringly wrong than others. Cumulatively, however, the sum total of her unreliable testimony, in its entirety, renders her testimony as a whole inadmissible. The Court can base its decision on "the same broad latitude [the Court has] when deciding how to determine the reliability of expert testimony as it enjoys in determining whether the testimony is reliable,"  *Kumho Tire*, 526 U.S. at 142, cited by *Toole v. Baxter Healthcare Corp.*, 235 F.3d1307, 1312 (11th Cir. 2000). Plaintiff thus urges this Court to consider Dr. Baker's overall testimonial strategy in this case, based on her inconsistent assumptions and ipse dixit statements, offered while rejecting the probative external labor market comparison offered by Plaintiff.[22] This stratagem, to co-opt <u>both</u> analytical

_____

[22]Dr. Baker's assertion (Baker Dep. 75-76) that "I don't recall specifically" the outcome of a recent case where her opinion sought to rebut EEOC's economist expert is simply non-credible. Decided three weeks prior to her deposition in this matter, the *Paramount Staffing* court noted that Dr. Baker was not present at the *Daubert*  hearing which led to the judge's ruling (because, it turns out, she had been withdrawn by Defendant who ceased to rely on her opinion). He rejected her testimony as "unsupported, non-expert interpretation" of EEOC regulations, for her reliance on articles "that do not describe the employment process at Paramount", and for her objection to the use of 2000 U.S. Census data that differed from her outlier assumptions concerning Hispanic

alternatives that could apply in a hiring or promotion case, by presenting applicant flow <u>and</u> external workforce snapshot opinions, could only have probative value if both options entail reliable assumptions and methods. Dr. Baker's failure to accurately state and present each element of her own analysis, as well as key parts of her critique of Plaintiff's expert, constitutes an independent dimension for the Court to reject her proffered opinions.

### 2.  Dr. Baker Inconsistently Defines Defendant's Store Managerial Staff

Focusing on sections IV and V of Dr. Baker's report (Doc. 46-1, pp. 19-25), covering the age comparison of CSMs, and District 36 "store personnel" relative to "external labor market data", the inconsistency of her approach emerges even more clearly. She varies, from table to table, between the at-issue job, CSM, and the over inclusive enumeration of all levels of store management, both including and excluding the Inventory Control Manager ("ICM") title, which she concedes is not a managerial position. Thus, each of her three tables, Table 2, Appendix Table C, and Appendix Table D, are materially incorrect in multiple respects and consistently misleading.

### 3. Dr. Baker Improperly Rejects the Applicable Census External Benchmark Comparison

Dr. Baker claims that "there are no external labor market data sources that would allow for the construction of a reliable measure of older worker availability for the CSM job **alone**" (Doc. 46-1, footnote 32) (emphasis added). That qualifier renders her statement irrelevant to the analysis of this case. As someone who has used Census EEO Special File occupational data before, Dr.

---

availability, 109 F.E.P. Cases (BNA) at 971.

Baker is fully aware that some codes are not a perfect match to every company's workforce, in which case adjustments can be estimated if the possible variation materially alters the expert's conclusion; otherwise minor disparities are understood as unavoidable elements of the Census data process. In this case, the occupational category in question is Census code 470, "First Line Supervisors/Managers of Retail Sales Workers". Her complaint, truly frivolous, is that because code 470 is not limited to retail food store managers, rather than managers of any retail store workers, it is too imprecise for use as a benchmark.

This is the only basis on which she can contest, albeit indirectly, Dr. LaJeunesse's finding that the proportion of CSMs age 40 and above employed by Winn-Dixie in District, 15.8 percent, is significantly less than the proportion of similarly identified supervisors/managers of retail sales workers in the general population in that same geographical area, 51 percent. The probability that such a wide disparity is a random statistical quirk is .003, or three chances in one thousand observations. The alternative hypothesis that scientists and scholars would accept at any point below .05, or five chances in one hundred, is that Winn-Dixie's CSM hiring is affected by employee age.

As emphasized above, the line between admissible expert testimony and that which should be either limited or excluded is flexible, with great discretion left to the trial court. The tipping point often rests with non-credible, manifestly unreliable utterances, such as Dr. Baker's opinion that, in each of its aspects, tries to confuse and bury the most direct comparison of CSMs possible, like that provided by Dr. LaJeunesse's labor market snapshot comparison.[23]

---

[23]Dr. Baker does not directly rebut the significant disparity that Plaintiff finds by

The "literally exact comparison" standard implicit in Dr. Baker's assumptions underlying her analysis of this case was rejected by the D.C. Circuit in favor of more reasonable flexibility when making occupational comparisons, or "cross-mapping". As Judge Wald clearly explained in *DeMedina v. Reinhardt*, 686 F.2d 997 (D.C. Cir. 1982), it is not always possible for plaintiffs' statistical comparison to mirror the exact number of worker characteristics one hundred percent, because the data does not exist in such precise format.[24] As she noted, "to the extent that the district court rejected the statistics for failure to account for such skills, the court imposed an additional and unnecessary requirement for a large number of Agency positions.".... "statistical data, so far as we can tell from the record, are simply not available correlating [Census data and specific skills]; in their absence, we think it appropriate here to afford the plaintiffs the benefit of a rebuttable presumption of an equal distribution of the relevant [ ] skills." *Id.*, 686 F.2d at 1008.

Similarly here, Dr. Baker's portrayal of the absence of data cross-tabulating age by occupation by geography  as a deficiency in Plaintiff's statistics is not merely without merit, but excludable under the various principles and authorities cited, *ante* and *post*. Her criticism on these grounds also fails analytically, because the at-issue proportion - retail supervisors and managers age 40 and above - is relatively insensitive by geography, rendering any variation essentially

---

comparing the proportion of CSMs age 40 and over against similar retail supervisors/managers in the District 36 geographic area, which corroborates EEOC's claim that Mr. Bradberry's non-promotion was age-related.

[24]In *DeMedina,* plaintiff's statistical proof estimated female availability comparing Census-determined occupations against General Schedule ("GS") federal occupations. The same principle applies here.

irrelevant.[25] In no instance would the significance of Dr. LaJeunesse's comparison to Defendant's age profile for CSMs be affected by his assumption that Dallas County (the site of Store 543 and this controversy) has the same proportion of older retail managers as Montgomery and Tuscaloosa counties combined, for which data is available.

B.      **Dr. Baker's Own Analysis Improperly Assumes the Reliability of Defendant's Data on Applicants for the CSM Position, Along With Her Other Unsupported *Ipse Dixit* Assumptions**

1. **Defendant's Data**

As pointed out in section I of this Response and Motion, Dr. Baker made no effort to reconcile the database provided to her by Defendant and the questionable number of applicants shown. Instead, she assumed that such information is reliable and can serve as the foundation for her opinion that age is not a factor in Winn-Dixie's promotion process.[26] Dr. Baker noted, in footnote 33 to her Report, in ten instances there were no other candidates than the selectee (Doc. 46-1, footnote 33). Appendix Table C also shows that in thirteen of the selection pools, only two candidates were considered and one was selected (Doc. 46-1, Appendix C).

---

[25]For Montgomery County, 51.46 percent; for Tuscaloosa County, 50.59 percent; the two counties combined, 51.13 percent. For Birmingham, the largest city in the State, 50.74 percent. 2000 Census, EEO Special File (2003).

[26] Significantly, when Winn-Dixie produced the applicant data to the EEOC, it did not represent it to be accurate or complete.  Instead, its counsel stated it was producing merely "a list of known applicants." See July 9, 2010 letter from Jennifer McGahey to Marsha Rucker attached as part of Exhibit 2 to Plaintiff's Evidentiary Submission (emphasis added).  Dr. Baker, in her biased eagerness to aid Winn-Dixie, ignores this expressed limitation, and analyzed this data, while at the same time admitting she had "not been able to assess the completeness and accuracy of the data that have been provided." (Doc. 46-1, footnote 33).

Such patterns raise serious concerns about a promotion process that does not reflect broader interest amongst eligible incumbent employees, and qualified external potential candidates. The information provided leaves unanswered why so few CSM applicants were reported, and the extent to which potentially interested individuals were either unaware of vacancies or deterred from applying by a belief that their qualifications would be ignored in favor of pre-selected candidates. Experts who rely solely on information spoon-fed to them by counsel thus cannot be regarded as offering reliable and admissible testimony.[27]

Beyond that, Dr. Baker indirectly acknowledges the possibility that the applicant data could be tainted, in her deposition testimony covering the dearth of applicants for 27 of the selections. She then conceded under questioning, with respect to Appendix Table C, that there is an unexplained difference between the number of older applicants on the basis of each vacancy, and the sum total number of those events. (Baker Dep. p. 198: "I don't know it. And certainly if it's an error I'll correct it.").

Appendix Table C, along with Dr. Baker's overall testimony concerning Winn-Dixie's hiring process and age, is thus fatally compromised. The total absence from her opinion of  the existence or status of any external candidates for CSM positions further undermines Dr. Baker's analysis of this case, insofar as Plaintiff's snapshot comparison involves the external availability of supervisory and managerial workers relative to those employed by Defendant as CSMs, and

---

[27]*Guinn v. Astra Zeneca Pharmaceuticals*, 602 F.2d 1245, 1251 (11th Cir. 2010) (excluded expert relied solely on records provided by counsel and ignored other factors affecting her opinion); *Bailey v. Allgas, Inc*., 148 F.Supp.2d 1222, 1240 (N.D. Ala. 2000), *aff'd*., 284 F.3d 1237, 1248-49 (11th Cir. 2002) (excluded economist relied on counsel rather than doing independent analysis of relevant market).

she ignores the question entirely. (Baker Dep. 190: "I don't know that any formal public announcement [of the postings] was made."). Such an analysis is insufficiently reliable to be admitted here. *Daubert*, 509 U.S. at 590-91; *Phillips v. American Honda Motor Co*., 238 Fed.Appx. 537, 540 (11th Cir. 2007) (unreliable expert excluded). The principal assumption of Dr. Baker's rebuttal opinion, that her statistical comparisons by age included the complete universe of actual and otherwise qualified applicants, is sufficiently infirm as to be held inadmissible and stricken.

### 2. The Flaws in Both Dr. Baker's Own Analysis and in Her Rebuttal

It is one thing for opposing experts to offer opinions within a reasonable range of disagreement that the courts can regard as still within the range of "the same level of intellectual rigor"[28] to qualify for presentation to a jury. It is quite another for Dr. Baker to blatantly ignore the statistical conventions that have evolved over the past forty years of equal employment opportunity litigation, as the sections of her rebuttal opinion addressed in this Response and Motion clearly do.

Reference to *Bazemore v. Friday*, 478 U.S. 385, 400 (1986), the Supreme Court's sole comment on the criteria for evaluating rebuttal expert testimony, clarifies what Dr. Baker did not do. For her criticism of Dr. LaJeunesse's snapshot analysis to achieve admissible reliability, Dr. Baker would be required to show that by removing the purported inaccuracy - attributable to the difference between the ages of food and non-food retail managers, - she could eliminate the statistical significance detected by the Commission's expert. By ignoring this aspect of his

---

[28]*Kumho Tire*, 526 U.S. at 152; *Rink v. Cheminova, Inc., ante*.

opinion entirely (and by speculating that Census code 470 is an over inclusive comparator), her proposed testimony is squarely at odds with *Bazemore* and should be stricken.

Dr. Baker's next overarching flaw adheres to the pattern she follows, namely to create "apples and oranges" differences between the opposing expert's analysis and her critique, arguing that because she is correct the challenged approach must be deficient. Plaintiff EEOC, against whom Dr. Baker has testified on several occasions, contends that, if admitted, such conflict-creating stratagems result in confused and unassisted juries, and are manifestly unhelpful to the trial process. While "dueling experts" who interpret similar facts under differing assumptions are a staple of litigation generally,[29] testimony that exploits artificial or meaningless factual differences, like that at issue here, should not be accorded the same level of deference as opinions which meet gatekeeper scrutiny.

This point is best illustrated by Dr. Baker's inconsistency concerning the ICMs, which she treats as part of the overall store management category in part of her opinion, and then omits them elsewhere in her testimony. Her treatment of the ICMs is but one subset of the range of various definitions in her report, which fails to focus on the at-issue CSM position sought by Mr. Bradberry. (Baker Dep. p. 185).

In Table 2 of her report ICMs are excluded because, correctly, "they do not supervise other employees" (Doc. 46-2, footnote 42) (as do the CSMs), but are included in Appendix Table D as part of the store total. The net effect, again, is for Dr. Baker to inject several layers of

---

[29] *Merisant Co. v. McNeil Nutritionals*, 2007 WL 707359 (E.D. Pa. 2007) (denying "dueling" *Daubert* motions where both experts' opinions are admissible).

difference regarding the construction of comparison pools for statistical analysis, unduly burdening the Court as well as the triers of fact who will eventually decide this matter.

### C.   Additional Response to Defendant's Arguments Concerning Dr. LaJeunesse's Workforce Analysis

Winn-Dixie's overarching objection to Dr. LaJeunesse's opinion boils down to improper comparisons (Doc. 73, page 17 of 23) and the absence of an applicant flow analysis (Doc. 73, p. 20 of 23). Plaintiff's has already covered these points in some detail in discussing the admissibility of the testimony of Dr. Baker because her opinion parrots Winn-Dixie's legal argument (or, arguably, the legal argument mimics Baker's flawed assault on Plaintiff's statistical proof).

Dr. LaJeunesse did not perform an applicant flow analysis because the discovery request for that information was not fulfilled until July 9, 2010, subsequent to the deadline for Dr. LaJeunesse's Report. In line with the precedents of Title VII law that applicant flow analyses, when undistorted, are most accurate because they reflect actual hiring decisions, the Commission would have preferred to submit an assessment of that information by Dr. LaJeunesse. The case law is also clear that, absent applicant flow, or when it is incomplete or unusably tainted, proxy data comparing snapshots of the employer's workforce to comparably available individuals in the relevant labor market is an appropriate substitute.

Defendant's challenge on these grounds is not merely misplaced, but borders on frivolous. As the party controlling information on its employment practices, Winn-Dixie cannot withhold from discovery the data needed to evaluate whether, beyond Bradberry's individual complaint, age played any role in the promotion of CSMs in District 36, and then request the exclusion of Dr.

21

LaJeunesse for failing to analyze it.

In the alternative, the need for caution in the analysis of Defendant's applicant flow data due to its possible unreliability suggests that a refined external proxy analysis would not be unwarranted on that basis, which is what Plaintiff's expert did perform. Arguably, if the applicant flow data was at hand, he would have performed both tests to evaluate the company's employment practices in more detail. That is what Dr. Baker attempted to do, so there is no basis for the Court to assume that Dr. LaJeunesse would not also have done so, had the entire quantum of data been supplied to him on a timely basis. On either or both of these grounds, Defendant's "failure to analyze applicant flow data" assertion should be rejected by this Court.

Defendant's other objection, labeled "apples to apples" (Doc. 73, p. 17 of 23) but inferring that EEOC compared "apples to oranges", is incorrect for several reasons. These reasons have already been covered, but will be summarized here. These points will be reiterated and are referred to as (1) Census labor market geography, (2) Census occupational category, and (3) statistical significance.

Defendant's Motion disparages Dr. LaJeunesse's analysis as a "cocktail napkin" calculation "that has no place in this single plaintiff disparate treatment case", comparing CSMs in District 36 to the <u>Montgomery</u> and <u>Tuscaloosa</u> County workforce. Winn-Dixie is wrong, because statistical evidence is admissible to support an individual plaintiff's case, by inferring that an age-imbalanced CSM workforce is consistent with a work environment within which the individual's claim arose.

Second, Winn-Dixie's argument misses the mark because, as explained previously, the Census Bureau does not release data cross-classifying occupation by age <u>and</u> geography for

22

counties of fewer than 100,000 persons, hence the only District 36 counties shown are Montgomery and Tuscaloosa. Dr. LaJeunesse then reasonably inferred that Dallas County, which includes Selma and Store 543, had a similar proportion, e.g., 51.1 percent, a method deemed unobjectionable in the universe of EEO analysis and backed up by case law favoring the closest possible comparison as a reasonable interpretation of plaintiffs' evidentiary burden. Federal courts also have held that where an expert's opinion is contrary to law[30] or regulation, as is Dr. Baker's objection to the use of Montgomery and Tuscaloosa counties combined as the proxy for District 36's proportion of older retail managers, it is *per se* excludable. See, U.S. Dept. of Commerce, Bureau of the Census, Revised Criteria for Census Bureau Public Use Data Products, 68 Fed. Reg. 23693 (2003).

Both Census geography and occupational comparability are combined in Defendant's fruitless challenge, supported by irrelevant and dissimilar cases. Winn-Dixie's Motion discusses the principle of "relevant" statistical comparisons and cites *Griffin v. Gulfstream Aerospace Corp.*[31], but ignores the obviously irrelevant data offered in that case, the total population age 25 and above with a high-school education as a proxy for job qualifications. The obviously flawed comparison in *Griffin* is not similar to the methodology used by Dr. LaJeunesse. Similarly, reference to *Peightal v. Metropolitan Dade Co.*[32], where the Eleventh Circuit observed that

---

[30]*Saldana v. Kmart Corp.*, 260 F.3d 228, 233 (3d Cir. 2001).

[31]2004 WL 5518161 (S.D. Ga. 2004).

[32]26 F.3d 1545 (11th Cir. 1994).

statistical data must be "finely tuned", 26 F.3d at 1554-55, ignores the refinement of Plaintiff's statistical comparison, limiting the expert's focus to the CSM pool, contrary to the multiple approaches contained in Dr. Baker's alternative statistical tables, varying between the inclusion and exclusion of ICMs, and the enumeration of other store managerial staff as distinct from the center store managers at issue in this case. If there are any violations of the refinement required by *Peightal*, raised by Defendant, it is Dr. Baker's rebuttal opinion that is deficient.

Another fallacy in Defendant's Motion is its misinterpretation of statistical analysis in an individual disparate treatment case. As explained above, Winn-Dixie commingles and confuses the supporting role of an inference, drawn from a significant disparity between the proportion of CSMs age 40 and above employed in District 36 and the proportion of similarly aged supervisors/managers of retail sales workers in that geographical area, and decisions made by District 36 executives covering any individual employees under their jurisdiction. Because Dr. LaJeunesse's statistics are sufficiently reliable as to be admitted, the <u>relevance</u> of Plaintiff's statistics, which reflect the aggregate pattern of Winn-Dixie's employment practices relative to an external benchmark, then simply becomes a matter of weight to be decided by the jury.

Winn-Dixie seriously misrepresents the record and contradicts its own position in arguing that there should be no analysis of the CSM hiring decisions throughout District 36, but instead the analysis should be limited to the one store in Selma, Alabama, managed by store director Crane. (Doc. 73, p. 18 of 23). Winn-Dixie makes this argument by arguing that the decision to hire Godwin over Bradberry was made by Crane. Winn-Dixie at least infers that Crane made the decision alone and that no one from the district level was involved in the decision. This is untrue and Winn-Dixie knows it. Winn-Dixie represented to the court in its memorandum of law in

24

support of its motion for summary judgment that someone from District – level management was required to be involved in interviews for CSM positions and the final hiring decision was made with input from District – level management.  (Doc. 66, p. 9-11).  Winn-Dixie also acknowledged that Drew Elkins from the district level both participated in the interviews of Bradberry and Godwin and had input into the decision to hire Godwin rather than to promote Bradberry. (Doc. 66, p. 15-17).  Therefore, there is every reason to examine the CSM selections throughout District 36, and Winn-Dixie's argument that the focus should be limited to store 543 is frivolous.

Equally specious is Defendant's claim that comparisons to the 2000 Census EEO File "from 10 years ago" inadequately reflect current workforce ages and proportions. Such information has historically been collected on a decennial basis by the Census Bureau and, going back to 1980, has become available for every ten year period as they are analyzed and released. Any suggestion of unreliability requires the proponent of that view to demonstrate not just that the workforce composition has markedly changed over a subsequent time period, but that the statistical significance under attack no longer exists due to such newly available evidence. Absent such information, (a new EEO File covering the years up to and including 2010 will become available in 2012), such a challenge fails.

## IV.   CONCLUSION

For the foregoing reasons, Dr. LeJeunesse's reliance on an external benchmark due to Defendant's refusal to timely produce applicant flow data is justified and not contrary to law. His use of the most current Census data that best fits the position at issue in this case is in keeping with the methods commonly employed and accepted in the field.  Dr. Baker's attacks on Dr.

LeJeunesse and her opinions and proposed testimony on behalf of Defendant Winn-Dixie do not satisfy Federal Rules of Evidence 401, 402, 403, 702 and 703, or the legal standards for the admissibility of expert testimony set forth in the Expert Witness Trilogy and later cases. Consequently, Plaintiff EEOC moves that Dr. Baker be excluded from testifying by this Court.  In the alternative, EEOC moves that her testimony be limited to strike those aspects of the proposed opinion deemed inadmissible, as argued above, if the Court does not hold her testimony to be inadmissible in its entirety.

Respectfully submitted,

C. EMANUEL SMITH
Regional Attorney
Mississippi Bar # 7473

JULIE BEAN
Supervisory Trial Attorney
DC Bar # 433292

/s/ Marsha L. Rucker
Marsha L. Rucker/Lead Counsel
Trial Attorney

/s/ Gerald L. Miller
Gerald L. Miller
Trial Attorney
(MILLG 1454)

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
Birmingham District Office
Ridge Park Place, Suite 2000
1130 22nd Street South
Birmingham, AL 35205
Telephone: (205) 212-2046
Facsimile:  (205) 212-2041

<u>**CERTIFICATE OF SERVICE**</u>

   I hereby certify that on December 30, 2010, I filed the foregoing with the Clerk of Court using the CM/ECF system which will electronically send notification of the filing to the following attorneys of record:

      John W. Smith T
      Jennifer J. McGahey
      Bradley Arant Boult Cummings LLP
      One Federal Place
      1819 Fifth Avenue North
      Birmingham, AL

This the 30th day of December, 2010

      <u>/s/Gerald L. Miller</u>
      GERALD L. MILLER
      Trial Attorney