# EXHIBIT 1

# American Court Reporting
## toll-free (877) 320-1050

---

**Page 1**

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE SOUTHERN DISTRICT OF ALABAMA
3  NORTHERN DIVISION
4
5  CIVIL ACTION NUMBER
6  2:09-CV-0643-C
7
8  EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,
9    Plaintiff,
10  vs.
11  WINN-DIXIE, INC.,
12    Defendant.
13
14
15  DEPOSITION TESTIMONY OF:
16    MARY D. BAKER, PH.D.
17
18
19  August 10, 2010
20  9:30 a.m.
21
22  COURT REPORTER:
23  DIANA B. WILLIAMS, CCR, CLR

---

**Page 2**

1      MARY D. BAKER, PH.D.
2      INSTRUCTIONS TO THE WITNESS
3
4      Please read your deposition over
5  carefully before you sign it. You should
6  make all your changes on the attached
7  errata sheet.
8      After making any changes which you
9  have noted on the attached errata sheet,
10 sign your name on the Deponent's
11 Certificate and date it. You are signing
12 it subject to the changes you have made on
13 the errata sheet, which will be attached to
14 the deposition.
15     Return the attached errata sheet
16 and Deponent's Certificate to American
17 Court Reporting Service, Read & Sign
18 Department, P. O. Box 12765, Birmingham,
19 Alabama 35202.
20     According to the Rules of Civil
21 Procedure, you will have thirty (30) days
22 from the date you receive this deposition
23 in which to read it, sign it, and return

---

**Page 3**

1  the errata sheet and Deponent's Certificate
2  to the above office. If you fail to do so,
3  you automatically waive your right to make
4  any corrections to your deposition.

---

**Page 4**

ERRATA SHEET
PAGE  LINE  EXPLANATION

1  _____
2  _____
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____

---

1 (Pages 1 to 4)

## American Court Reporting
## August 23, 2010

**American Court Reporting**
**toll-free (877) 320-1050**

Page 5

DEPONENT'S CERTIFICATE

I, MARY D. BAKER, PH.D., the witness herein, have read the transcript of my testimony and the same is true and correct, to the best of my knowledge. Any corrections and/or additions, if any, are listed separately.

_____

MARY D. BAKER, PH.D.

_____

DATE

Sworn to and subscribed before me, this the ____ day of _____, 2010, to certify my hand and seal of office.

_____

NOTARY PUBLIC

Page 6

STIPULATION

IT IS STIPULATED AND AGREED by and between the parties through their respective counsel that the deposition of MARY D. BAKER, PH.D., may be taken before Diana B. Williams, Certified Shorthand Reporter and Notary Public, State at Large, at the offices of Equal Employment Opportunity Commission, Birmingham District Office, Birmingham, Alabama, on August 10, 2010, commencing at approximately 9:30 a.m.

IT IS FURTHER STIPULATED AND AGREED that the signature to and the reading of the deposition by the witness is not waived, the deposition to have the same force and effect as if full compliance had been had with all laws and rules of Court relating to the taking of depositions.

IT IS FURTHER STIPULATED AND AGREED that it shall not be necessary for any objections to be made by counsel to any questions, except as to form or leading questions, and that counsel for the parties

Page 7

may make objections and assign grounds at the time of trial or at the time said deposition is offered in evidence, or prior thereto.

Page 8

INDEX

EXAMINATION BY:            PAGE NO.
MS. RUCKER                 11
CERTIFICATE                215

INDEX OF EXHIBITS

PLAINTIFF'S EXHIBITS:          PAGE NO.
A   Notice of Deposition           15
B   Expert Disclosure              17
C   Bates Numbers 4576 - 4598      91
D   Bates Numbers 4375 - 4403      96
E   Bates Numbers 4408 - 4429      110
F   Bates Numbers 4530 - 4549      111
G   Bates Numbers 4567 - 4575      111
H   Bates Numbers 4550 - 4566      112
I   Bates Numbers 1170 - 1173      118
J   Bates Numbers 1139 - 1146      125
K   Job Descriptions               133
L   Bates Numbers 1128 and 1125    165
M   Bates Numbers 1132 - 1138      186

2  (Pages 5 to 8)

**American Court Reporting**
**August 23, 2010**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 9

1    A P P E A R A N C E S

2

3

4    FOR THE PLAINTIFF:

5        Marsha L. Rucker, Esq.

6        EQUAL EMPLOYMENT OPPORTUNITY

7        COMMISSION

8        1130 22nd Street South

9        Ridge Park Place, Suite 2000

10        Birmingham, Alabama 35205

11

12

13    FOR THE DEFENDANT:

14        Jennifer J. McGahey, Esq.

15        Bradley Arant Boult Cummings

16        One Federal Place

17        1819 Fifth Avenue North

18        Birmingham, Alabama 35203

19

20

21    ALSO PRESENT:

22        Robert M. LaJeunesse, Ph.D.

23

Page 10

1        I, Diana B. Williams, a Certified

2    Shorthand Reporter of Birmingham, Alabama,

3    and a Notary Public for the State of

4    Alabama at Large, acting as Commissioner,

5    certify that on this date, pursuant to the

6    Federal Rules of Civil Procedure, and the

7    foregoing stipulation of counsel, there

8    came before me at the offices of Equal

9    Employment Opportunity Commission,

10    Birmingham District Office, Birmingham,

11    Alabama, commencing at approximately

12    9:30 a.m., on August 10, 2010, MARY D.

13    BAKER, PH.D., witness in the above cause,

14    for oral examination, whereupon the

15    following proceedings were had:

16

17        MARY D. BAKER, PH.D.,

18    having been first duly sworn, was examined

19    and testified as follows:

20

21        COURT REPORTER:  Usual

22    stipulations?

23        MS. RUCKER:  Yes.  I assume you

Page 11

1    don't want to waive signature.

2        MS. MCGAHEY:  That's right.

3    Dr. Baker would like to read and sign.

4        MS. RUCKER:  Good morning.  This

5    is the deposition of Dr. Mary Dunn Baker in

6    the matter of EEOC versus Winn-Dixie, Case

7    Number 209-CV-643 in the United States

8    District Court for the Southern District of

9    Alabama.

10

11    EXAMINATION BY MS. RUCKER:

12        Q.  Dr. Baker, I have read

13    various -- your vitae and your resumé, and

14    I know that you have extensive experience

15    being deposed.  However, I will just

16    briefly run through some usual

17    stipulations.

18        Generally when you -- because

19    this deposition is being transcribed by a

20    court reporter, I would just caution you to

21    make sure that you give audible answers so

22    that it can be transcribed.  Try to avoid

23    uh-uhs and uh-huhs.  If you answer a

Page 12

1    question, I will assume you understood the

2    question.  We will take appropriate breaks.

3    You can ask for a break.  And when we get

4    to an appropriate stopping point, we of

5    course can stop for a break.  I will have

6    to explain to you where the restroom and

7    things like that are.  If you need for me

8    to repeat a question such as that you don't

9    understand it, feel free to do that.  I

10    know some people down here say I have an

11    accent so --

12        A.  I have one too.

13        Q.  So if you don't understand

14    anything or if I am rambling and things

15    like that, you can feel free to say, I

16    don't understand, and I will repeat the

17    question, or I will restate the question

18    for the floor.

19        It's fine to look at documents

20    to refresh your recollection.  In fact, I

21    expect you to, throughout the deposition,

22    to refer to various notes and particularly

23    your expert report, so that's fine.  It is

**American Court Reporting**
**August 23, 2010**

# American Court Reporting
## toll-free (877) 320-1050

Page 13

1 okay to speculate or guess at an answer in
2 this context as well.
3          Is there anything today that
4 would prevent you from giving truthful
5 testimony, such as, are you on any drugs or
6 medications that would prevent that?
7      A.  No.
8      Q.  Can you please state your name
9 and spell it for the record.
10     A.  Mary Dunn Baker. M-A-R-Y,
11 D-U-N-N, B-A-K-E-R.
12     Q.  And are you known by any other
13 names or aliases?
14     A.  No.
15     Q.  Are you married?
16     A.  Am I married?
17     Q.  Yes, ma'am.
18     A.  Yes, I am.
19     Q.  And your husband's name?
20     A.  Jay, J-A-Y, Baker.
21     Q.  And where do you currently
22 reside?
23     A.  In Tallahassee, Florida.

Page 14

1      Q.  And how long have you lived in
2 Tallahassee?
3      A.  I moved back to Tallahassee in
4 1986, so that would be 24 years.
5      Q.  And to your knowledge, do you
6 have any relatives that reside in the
7 Mobile, Alabama, area?  I'm asking that
8 because, in the event this goes to trial,
9 that's where our jury pool will be called
10 from -- that area.
11     A.  I do not.
12     Q.  And, Mrs. Baker, I understand
13 you live in Jacksonville.  However, where
14 are you originally from?
15     A.  I live in Tallahassee.
16     Q.  Okay.  Jacksonville.
17     A.  Tallahassee.
18     Q.  Okay.  But where are you
19 originally from?
20     A.  I was born in Eufaula, Alabama.
21 I grew up in Columbus, Georgia, and in Lee
22 County, Alabama.
23     Q.  Mrs. Baker, I'm going to show

Page 15

1 you what will be marked as Plaintiff's
2 Exhibit "A."
3          MS. MCGAHEY:  Would you like for
4 her to look at the one that is marked?
5          MS. RUCKER:  Yes.  You can hand
6 that back to me.  That's for Dr. Baker.
7 Thank you.
8      Q.  (BY MS. RUCKER)  Dr. Baker, I've
9 presented you with Plaintiff's Exhibit "A"
10 entitled "Notice of Deposition."  If you
11 can take a second or two and review that.
12          (Whereupon, a document was
13 marked as Plaintiff's Exhibit Number A and
14 is attached to the original transcript.)
15          MS. MCGAHEY:  Ms. Rucker, just
16 for the record, my copy seems to be two of
17 each page.  For the record's sake, I don't
18 know if you want to restaple Exhibit "A"
19 to --
20          MS. RUCKER:  Can I go off the
21 record for a minute.
22          (Whereupon, an off-the-record
23 discussion was held.)

Page 16

1          MS. RUCKER:  We can go back on
2 the record.  I would like to resubmit
3 Exhibit "A."
4      Q.  (BY MS. RUCKER)  Ms. Baker, I
5 have submitted again for your review
6 Exhibit "A," which is a notice of
7 deposition.  If you can take a brief moment
8 and review it.
9      A.  I have reviewed it.
10     Q.  Okay.  Dr. Baker, would you
11 testify that you received notice of the
12 deposition?
13     A.  I did.
14     Q.  And with respect to the
15 documents listed, 1 through 8, did you
16 bring those documents with you today?
17     A.  I did with the exception of Item
18 Number 4.  I don't have any documents that
19 relate to 4 at this time.  No invoice has
20 been prepared.
21     Q.  And, Dr. Baker, you did, in
22 fact, bring Number 8 which is your complete
23 work file in this matter?

4  (Pages 13 to 16)

## American Court Reporting
## August 23, 2010

# American Court Reporting
## toll-free (877) 320-1050

Page 17

1    **A.** I did.
2    **Q.** Dr. Baker, I'm going to show
3  you what will be marked as Plaintiff's
4  Exhibit 2.
5    MS. MCGAHEY: Ms. Rucker, are we
6  going to use letters or numbers?
7    MS. RUCKER: We are going to use
8  letters -- B. I will strike that. I will
9  restate the statement.
10   **Q.** (BY MS. RUCKER) Dr. Baker, I'm
11  going to show you what will be marked as
12  Plaintiff's Exhibit B.
13    (Whereupon, a document was
14  marked as Plaintiff's Exhibit Number B and
15  is attached to the original transcript.)
16    MS. RUCKER: Ms. McGahey, if you
17  can look through that. I believe pages 1
18  through 37 are there. We may have had an
19  issue with the stapler, but I believe that
20  they are all there.
21   **Q.** (BY MS. RUCKER) Dr. Baker, is
22  that a complete and accurate report that
23  was filed as your expert-witness

Page 18

1  disclosures as reflected in Plaintiff's
2  Exhibit B?
3    **A.** My report is a part of
4  Exhibit B. I have not seen the first three
5  pages of Exhibit B.
6    **Q.** So with respect to Appendix A,
7  that would be your complete report?
8    **A.** It is.
9    **Q.** Dr. Baker, with respect to your
10  educational background, can you provide
11  where you attended undergraduate school at?
12    **A.** Auburn University.
13    **Q.** And what degree did you receive?
14    **A.** A bachelor's degree.
15    **Q.** In what field of study?
16    **A.** In political science and
17  economics.
18    **Q.** And, then, is it correct that
19  you received a Ph.D., after that?
20    **A.** I received a master's degree
21  after that and subsequently the Ph.D.
22    **Q.** And where did you obtain the
23  master's degree?

Page 19

1    **A.** Auburn University.
2    **Q.** And what was your field of
3  study?
4    **A.** Economics.
5    **Q.** And was it any particular field
6  of economics, or was it generalized study?
7    **A.** My research in the master's
8  program was in labor economics.
9    **Q.** And then after you received a
10  master's, what degree did you receive after
11  the master's?
12    **A.** The Ph.D. in economics.
13    **Q.** And where did you receive the
14  Ph.D. from?
15    **A.** Florida State University.
16    **Q.** And what field is your Ph.D. in?
17    **A.** Economics.
18    **Q.** Any particular branch of
19  economics?
20    **A.** My fields in the Ph.D. program
21  were primarily regulation and industrial
22  organization and environmental economics.
23    **Q.** With respect to environmental

Page 20

1  economics, did you take any field
2  examination?
3    **A.** I did.
4    **Q.** And what was that field
5  examination?
6    **A.** I don't understand the question.
7    **Q.** I will strike that.
8    When did you take the field
9  examination?
10    **A.** It would have been prior to
11  1986, possibly prior to 1984.
12    **Q.** But you don't recall the
13  particular year?
14    **A.** I don't recall.
15    **Q.** And where did you take the field
16  examination?
17    **A.** In environmental economics?
18    **Q.** Yes.
19    **A.** At Florida State University.
20    **Q.** And did you take a field
21  examination in labor economics?
22    **A.** I did not. I didn't study labor
23  economics specifically in the Ph.D.

5 (Pages 17 to 20)

# American Court Reporting
## August 23, 2010

**American Court Reporting**
**toll-free (877) 320-1050**

Page 21

1 program, because I had studied that
2 literature in the master's program and I
3 had taught labor economics at Auburn
4 University at Montgomery, and I felt that I
5 was sufficiently familiar with that
6 literature and theory and empirical
7 evidence to spend some time to focus on
8 other areas.
9    Q.  Did you take a field examination
10 in regulated industries?
11    A.  I did.  I believe it was called
12 "regulation and industrial organization."
13    Q.  And with regard to this field
14 examination, do you recall when you took
15 this field examination?
16    A.  Would have been during the same
17 week as I took the exam in environmental
18 economics.
19    Q.  And did you receive a passing
20 score in both examinations?
21    A.  Indeed I did.
22    Q.  Dr. Baker, what is your current
23 employment?

Page 22

1    A.  I am employed by a firm called
2 ERS Group.  ERS stands for Economic
3 Research Services.
4    Q.  And in what capacity are you
5 employed?
6    A.  My current title is director.
7    Q.  And how long have you held the
8 title as director?
9    A.  My CV might reflect that.  Since
10 December 1998.
11    Q.  And can you summarize what your
12 duties are as director?
13    A.  My duties as director are the
14 same duties that I have had since I began
15 my employment at ERS Group.  I was called
16 earlier a vice president and senior
17 research economist.  And titles changed at
18 some point, obviously, December 1998.  But
19 I spend most of my time conducting
20 statistical analyses of employment
21 practices and decision-making processes,
22 such as hiring, promotion, termination,
23 pay, performance ratings, disciplinary

Page 23

1 actions.  I also spend consider time
2 preparing economic loss estimates.  I am
3 often asked to review and critique
4 statistical analyses and lost estimates
5 that have been prepared by others.  I plan
6 and organize and present seminars on the
7 use of statistics in employment-
8 discrimination cases and occasionally
9 seminars on evaluation of economic losses
10 allegedly arising from a variety of events
11 or actions.
12    Q.  Is your work generally on behalf
13 of plaintiffs or defendants?
14    A.  More often I am retained by
15 defendants than plaintiffs, but I have been
16 retained by plaintiffs in a number of
17 matters.
18    Q.  With respect to ERS Group, are
19 you a principal or an owner in the company?
20    A.  I am not an owner.  I am also
21 not a principal, which is another job title
22 that economists in our office have.  It's a
23 level below director.

Page 24

1    Q.  Have you held any other titles
2 with ERS Group other than vice president
3 and senior research economist or director?
4    A.  Not to my knowledge.  But I will
5 say, when I started in 1986, I'm not sure
6 that we had job titles.  We distinguished
7 economists from computer programers and
8 research assistants and associates.  But I
9 may have had some title that I didn't know
10 about at that point in time.
11    Q.  And prior to your employment
12 with ERS, who was your previous employer?
13    A.  Auburn University at Montgomery.
14    Q.  And when were you employed by
15 Auburn University at Montgomery?
16    A.  I did -- or had two spells of
17 employment at Auburn University at
18 Montgomery.  From 1986 to 1981, I was an
19 instructor in the economics department.  I
20 left Auburn University at Montgomery to
21 pursue the Ph.D. at Florida State
22 University.  And in 1984, I returned to
23 Auburn University at Montgomery where I

6  (Pages 21 to 24)

**American Court Reporting**
**August 23, 2010**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 25

1  spent two years, 1984 to 1986, as an
2  instructor in the economics department.
3      Q.  During your initial stint as an
4  instructor at Auburn, what coursework did
5  you teach?
6      A.  I taught a variety of courses.
7  I taught labor economics.  I -- as did
8  everybody -- taught principles of
9  macroeconomics, principles of
10  microeconomics.  I taught a course called
11  "concepts of business."  I taught the
12  history of economic thought.  I taught
13  money and banking.  And I also taught a
14  course in comparative economic systems.
15      Q.  Did you hold any other positions
16  while employed by Auburn University at
17  Montgomery?
18      A.  I did not.
19      Q.  And then in your second stint as
20  professor, what coursework did you teach?
21      A.  I taught Principles of Economics
22  I and II, which is principles of
23  macroeconomics and principles of

Page 26

1  microeconomics, and contemporary economic
2  problems.
3      Q.  I noticed on your resumé as
4  reflected as a part of your expert report
5  that you list employment with Florida State
6  University; is that correct?
7      A.  Yes.
8      Q.  And what was your employment at
9  Florida State University?
10      A.  When I was in the Ph.D. program,
11  I was employed as a graduate instructor.  I
12  taught undergraduate courses in the
13  economics department.  And subsequent to
14  the completion of the Ph.D., I taught in
15  the economics department as an adjunct
16  professor.
17      Q.  Dr. Baker, at any point during
18  your course of study, did you take any
19  coursework on statistics?
20      A.  I did.
21      Q.  And can you summarize what that
22  coursework was?
23      A.  In the undergraduate program, I

Page 27

1  took a course -- the exact title of which I
2  can't remember, because it was many years
3  ago -- but it was essentially research
4  methods for the social sciences, and it was
5  a course that was taught by the political
6  science department.  And, in fact, it was
7  that very course that piqued my interest in
8  using statistics in research.  I may have
9  taken another statistics course in the
10  undergraduate program, but the one that I
11  have fond memories of was this research
12  methods for the social sciences.
13          In the master's program, I took
14  a course in the School of Business in
15  statistics, and I took a course in
16  econometrics.
17          While I was at Florida State
18  University, I took a course in the
19  statistics department that was statistics
20  for the social sciences, and I took two
21  courses in econometrics.
22          And many of the other courses
23  that I took that weren't statistics,

Page 28

1  per se, were very quantitative in nature.
2  Economics is a discipline and relies
3  heavily on statistical tools to study data.
4  So I was exposed to how statistics are used
5  to analyze issues such as compensation and
6  other courses.
7      Q.  Dr. Baker, I see listed on your
8  resumé that you also worked for Florida
9  Public Service Commission; is that correct?
10      A.  I worked for Florida Public
11  Service Commission one summer while I was
12  in the Ph.D. program at Florida State.
13      Q.  Was that a work-study program or
14  was that a fellowship or was it related to
15  your being a student?
16      A.  No.
17      Q.  And what was your position with
18  the Florida Public Service Commission?
19      A.  I worked as a planning and
20  research economist.
21      Q.  And do you recall what your
22  duties were in that position?
23      A.  Yes.  I analyzed issues that the

7 (Pages 25 to 28)

**American Court Reporting**
**August 23, 2010**

Page 29

1   Commission was considering as the
2   telecommunications industry moved from
3   being regulated to not regulated.
4       Q.  And you stated you worked there
5   one summer?
6       A.  One summer.
7       Q.  Other than your employment at
8   Florida Public Service Commission, Auburn,
9   or Florida State, are there any other -- is
10  there any other employment not reflected on
11  the resumé?
12      A.  I worked as a graduate
13  instructor at Auburn University while I was
14  in the master's of economics program there.
15      Q.  And do you recall when that was?
16      A.  It would have been 1975 and
17  possibly 1976.
18      Q.  Dr. Baker, I believe you
19  provided some testimony regarding that one
20  of your field of expertise is in regulated
21  industries.  How did you obtain your
22  specialty -- or what experience or
23  coursework did you have that led to your

Page 30

1   specialization in this field?
2       MS. MCGAHEY:  Objection to the
3   form.
4       MS. RUCKER:  I can restate it,
5   if it would be easier.  I will strike it.
6       Q.  (BY MS. RUCKER)  With regard to
7   your specialty in regulated industries, how
8   did you obtain experience in that field?
9       A.  I took courses in that
10  subdiscipline of economics at the
11  Ph.D. level.
12      Q.  Did you ever teach in that
13  field?
14      A.  Not that I recall.
15      Q.  Were you ever employed --
16      A.  Well, let me take that back.
17      Q.  I didn't mean to interrupt you.
18      A.  Some of the courses that I
19  taught at Auburn University at Montgomery
20  would -- portions of them would have
21  addressed regulated industries and
22  industrial organization.  But I never
23  taught a course that I recall that was

Page 31

1   strictly devoted to that one area of study.
2       Q.  Were you ever employed in that
3   field?
4       A.  When I worked at the Florida
5   Public Service Commission, I was working in
6   that subdiscipline of economics.
7       Q.  Have you ever supplied any
8   consulting services in that field of
9   expertise?
10      A.  Issues of regulation may have
11  arisen in some of the cases on which I
12  worked, but that certainly was not the
13  focus or primary focus of the project.
14      Q.  Dr. Baker, I note on your resumé
15  that one award that you received is the
16  Best Lawyers Preferred Experts 2007.  Can
17  you explain who bestowed that award?
18      A.  An organization called "Best
19  Lawyers."
20      Q.  And do you recall any
21  information about this organization?
22      A.  I have looked at this
23  organization's Web site on a number of

Page 32

1   occasions.  It provides information about
2   attorneys, ones whose information I have
3   reviewed happen to be those who practice in
4   the labor and employment area or who are
5   litigators.  And I have also reviewed
6   information provided on that Web site about
7   other social scientists.
8       Q.  Are you a member of this
9   organization?
10      A.  No.
11      Q.  Did you submit a nomination for
12  this award?
13      A.  No.
14      Q.  Do you recall who nominated you
15  for this award?
16      A.  I do.
17      Q.  Who nominated you?
18      A.  Jim Alexander.
19      Q.  And who is Mr. Alexander?
20      A.  He is an attorney at Littler
21  Mendelson here in Birmingham.
22      Q.  Do you know if he's primarily a
23  defense or plaintiff counsel?

8  (Pages 29 to 32)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 33

1    A. I believe he represents
2 defendants. That's not to say that he's
3 never represented a plaintiff but, if he
4 has, I don't know about it.
5    Q. And with regard to this
6 organization, the Best Lawyers Preferred
7 Experts, do you know if it's primarily
8 comprised of defense or plaintiff counsel?
9    A. I don't know.
10    Q. And I believe you testified that
11 you searched the Internet and found this
12 organization; would that be a fair
13 statement?
14    A. I visited the Web site of this
15 organization on several occasions. I don't
16 know that I would say that I searched it.
17 I became aware of it when they notified me
18 that I had been named a preferred expert.
19    Q. Are you listed as an expert on
20 this Web site?
21    A. I was.
22    Q. Are you no longer listed as an
23 expert?

Page 34

1    A. I don't know.
2    Q. Did you submit a resumé to this
3 organization to get on their list?
4    A. Not to get on their list. I
5 don't recall if I supplied any information,
6 like my CV or something along those lines,
7 after I was named to this list.
8    Q. Are you a member of any
9 associations?
10    A. And by "associations," you mean
11 like professional organizations?
12    Q. Professional organizations, yes.
13    A. I am a member of the American
14 Economic Association. I believe my dues
15 are current with the Southern Economic
16 Association. I am a member of an
17 association that's part of the American
18 Economic Association called the "National
19 Association for Forensic Economics," or
20 NAFE. I believe some others may be listed
21 on page 5 of my CV. I am a member of the
22 American Association for Affirmative
23 Action. I am a member of the American Bar

Page 35

1 Association, Section on Labor and
2 Employment. And I don't know if this falls
3 into the category in which you are
4 interested, but I am on the Auburn
5 University College of Business Advisory
6 Board -- I'm sorry -- the Auburn University
7 MBA Advisory Board.
8    Q. And with respect to the
9 professional organizations you testified
10 that you have membership, how do you
11 generally become a member? Is that by
12 paying a fee; or, with any of those
13 organizations, were you nominated to become
14 a member?
15    A. Well, to become a member of the
16 American Association for Affirmative
17 Action, the American Economic Association,
18 the National Association of Forensic
19 Economists, and the Southern Economic
20 Association you pay dues. And I don't know
21 that they refuse to accept dues from
22 anybody.
23    Some other organizations of

Page 36

1 which I am a member are scholastic
2 honoraries, and there you are nominated and
3 elected for membership. But I don't think
4 of those as professional organizations in
5 the same way as I think about the American
6 Economic Association and other similar
7 groups.
8    Q. Do you know what scholastic
9 honorary societies that you are a member
10 of?
11    A. Yes. They are also listed on my
12 CV on page 2. I was inducted into Alpha
13 Lambda Delta, which is a freshman women's
14 honor society; Omicron Delta Epsilon, which
15 is the economics honor society; Pi Sigma
16 Alpha, which is the same for political
17 science; and Phi Kappa Phi.
18    Q. And in those scholastic
19 organizations, were you nominated during
20 your graduate coursework or undergraduate
21 career?
22    A. I was inducted into Alpha Lambda
23 Delta, Omicron Delta Epsilon, and Pi Sigma

9 (Pages 33 to 36)

**American Court Reporting**
**August 23, 2010**

# American Court Reporting
## toll-free (877) 320-1050

Page 37

1   Alpha as an undergraduate student and Phi
2   Kappa Phi as a Ph.D. student.
3       Q.  Dr. Baker, I noticed from your
4   resumé that you have been engaged to speak
5   at a number of workshops and make a number
6   of presentations.  I'm not going to run
7   through them all.  But with respect to the
8   ones cited on your resumé, were any of
9   these presentations made to primarily
10  plaintiff organizations?
11      A.  Let me look through them and --
12      Q.  Please do.
13      A.  And how about as I come to them,
14  I tell you about them so I don't have to go
15  through it several times to catch them all?
16      Q.  That's fine.
17      A.  On page 3 of my CV, the fourth
18  entry down, "The Use of Labor Economists in
19  Wage and Hour Cases," American Conference
20  Institute's 3rd National Forum on wage and
21  hour claims and class actions, in October
22  2006, that is a conference that was
23  attended by both, attorneys from the

Page 38

1   plaintiffs' Bar as well as the management
2   Bar.
3       Also on page 3, a little more
4   than halfway down the page, "Using
5   Statistics to Support and Defend Adverse
6   Impact Age Discrimination Claims," a
7   presentation that I made at a regional
8   meeting of the ABA-EEO Committee for
9   Liaison with EEOC, OFCCP, and DOJ in New
10  Orleans in 2005.  Individuals who represent
11  plaintiffs were in attendance at that
12  conference.  There were also some defense
13  attorneys.
14      There were individuals who
15  represent plaintiffs, or claimants, at the
16  South Florida Industry/OFCCP Liaison Group
17  conference in December 2004.  I spoke there
18  about compensation analysis.
19      The next entry, "Commonly Used
20  Statistical Techniques for Analyzing
21  Selections" and "Analyzing Compensation," I
22  made those presentations at a conference
23  for OFCCP and other Department of Labor

Page 39

1   attorneys, analysts, regional directors,
2   and others.
3       I made another presentation at
4   the regional meeting at the ABA-EEO
5   Committee for Liaison with EEOC, OFCCP, and
6   DOJ in New Orleans.  That presentation was
7   called "The Use and Abuse of Statistics in
8   Employment Discrimination Cases."  There
9   were plaintiff attorneys at that conference
10  as well as representatives from the three
11  agencies -- EEOC, OFCCP -- well, at least
12  two of them.  There might not have been
13  anybody there from Department of Justice.
14      The last entry on page 3 of my
15  CV is a presentation that I made along with
16  others at the American Bar Association's
17  Section on Labor and Employment Law, Equal
18  Employment Opportunity Committee's
19  Mid-Winter Meeting in 2001.  Plaintiff and
20  defendant attorneys were in attendance at
21  that conference.
22      Plaintiff and defendant
23  attorneys attended a seminar that ERS

Page 40

1   sponsored in 2000.  The title of the
2   program was "Detecting and Measuring Pay
3   Disparities:  Statistical Analyses of
4   Compensation."
5       My memory is that there were
6   some individuals from OFCCP in attendance
7   at a Jacksonville Industry Liaison Group
8   meeting where I gave a presentation titled
9   "Pay Equity Analysis in the New
10  Millennium."
11      In 1995, I made a presentation
12  at a Florida Bar continuing legal education
13  seminar about estimating economic damages,
14  and there were plaintiff and defendant
15  attorneys in attendance.
16      On page 4, there is an entry,
17  "Methodologies for Determining Economic
18  Damages or Possible Exposure in Employment
19  Discrimination Cases."  That's an ERS
20  seminar that we did on an annual or
21  semiannual basis from '95 through 1998.
22  And plaintiff and defendant attorneys
23  attended those conferences.

10  (Pages 37 to 40)

## American Court Reporting
## August 23, 2010

**American Court Reporting**
**toll-free (877) 320-1050**

Page 41

1       At ERS seminars, for many years,
2   I have made a presentation called "Commonly
3   Used Statistical Techniques" and "Methods
4   of Analyzing Compensation." And plaintiff
5   and defendant counsel attended those
6   seminars.
7       I made a presentation for the --
8   or at the Florida Bar Employment Law
9   Litigation Seminar in 1991 about using
10  economic and statistical evidence in
11  employment-discrimination cases. And
12  plaintiff and defendant attorneys were in
13  attendance at that conference.
14      So I don't suppose that there
15  are any that were primarily for plaintiff
16  counsel.
17      Q.  Would it be fair to state that
18  most of your presentations were made to
19  defendants' counsel or defendants' --
20      A.  No, I don't think so. When
21  attorneys are attending meetings at which
22  I'm speaking, it's usually both. Now, I
23  have done some seminars with law firms who

Page 42

1   represent defendants, but the attendees
2   were not necessarily attorneys. There may
3   have been some attorneys present, but they
4   were oftentimes human resources
5   professionals from organizations that those
6   law firms represent.
7       Q.  I notice in one of your
8   presentations -- I believe it was at the
9   presentation dated September -- a recent
10  presentation from September 24, 2009,
11  entitled "Demystifying Compensation
12  Analysis," as a part of your, I believe,
13  vitae, it was stated that these experts --
14  I believe referencing ERS -- have extensive
15  experience in --
16      MS. MCGAHEY:  Can you refer us
17  to the page, Ms. Rucker?
18      Q.  It's not listed on your vitae.
19  Maybe the question -- I will go back.
20      Did you make a presentation on
21  September 24, 2009, entitled "Demystifying
22  Compensation Analysis"? I believe it was a
23  webinar presentation for the Association --

Page 43

1   or American Affirmative Action Association.
2       A.  It was for the American
3   Association for Affirmative Action. And it
4   is listed on my CV. It is the second entry
5   on page 3.
6       Q.  Yes, I see it listed. And I
7   know -- at least on the advertisement, part
8   of the advertisement stated, these experts
9   have extensive experience in the
10  preparation of compensation analysis to
11  respond to allegations of discrimination
12  brought by government agencies and private
13  plaintiffs.
14      Do you recall that
15  advertisement?
16      A.  I don't know that I ever saw the
17  advertisement.
18      Q.  Would that be --
19      A.  But I think that's an accurate
20  description of part of what we do. We do
21  have extensive experience in the
22  preparation of compensation analyses.
23      Q.  To respond to allegations of

Page 44

1   discrimination?
2       A.  Yes.
3       Q.  And what would you say -- what
4   percentage of your work is geared to doing
5   that type of analysis?
6       A.  What do you mean by "that type
7   of analysis"? Compensation analysis?
8       Q.  Yes. And responding to
9   allegations of discrimination.
10      A.  I spend a substantial proportion
11  of my time preparing statistical analyses
12  to determine whether the data reveal
13  patterns that are adverse to a given
14  demographic group. I apply these tools to
15  compensation data as well as other
16  employment data.
17      Q.  And when you say the greater
18  majority of your time, would that be
19  50 percent of your time? 75 percent of
20  your time?
21      A.  Well, I don't think I said a
22  "greater majority." I think I said
23  something like a substantial proportion of

11  (Pages 41 to 44)

**American Court Reporting**
**August 23, 2010**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 45

1  my time.  I wouldn't be able to sort it out
2  specifically what proportion of my time is
3  spent on compensation analyses versus other
4  types of analyses, like hiring and
5  promotion and termination and other issues.
6      **Q.**  Do you ever prepare analysis
7  with regard to compensation analysis that
8  support allegations of discrimination?
9      **A.**  Well, the outcome of the
10  analysis can be used to determine whether
11  the data reveal patterns that are
12  inconsistent with the result of a
13  decision-making process that's neutral with
14  respect to protected group status -- or
15  demographic group status.  So you don't
16  prepare an analysis to support or not
17  support an allegation of discrimination.
18  You prepare the analysis, and the result of
19  it allows you to -- assuming that the
20  analysis is properly modeled and that the
21  data are sufficiently complete and
22  accurate -- the results of that analysis
23  allow you to make that determination.

Page 46

1      **Q.**  Do you ever prepare compensation
2  analysis on behalf of private plaintiffs?
3      **A.**  I have.
4      **Q.**  And do you recall in what
5  instances?
6      **A.**  Let me be sure I understand what
7  you are interested in.  Compensation
8  analyses that I've prepared when I have
9  been retained by plaintiffs?
10      **Q.**  Yes, ma'am.
11      **A.**  I have prepared compensation
12  analyses for plaintiffs.  And my memory is
13  that I did not give testimony in those
14  cases.  And I can't tell you exactly how
15  many times but, on several occasions over
16  24 years, I have prepared compensation
17  analyses for plaintiffs.
18      **Q.**  And do you recall -- when you
19  say "several times," do you mean more than
20  five times?
21      **A.**  You know, I can't tell you how
22  many times.
23      **Q.**  Were these in discrimination

Page 47

1  cases?
2      **A.**  They were.
3      **Q.**  Were these in ADA discrimination
4  cases?
5          MS. MCGAHEY:  You said ADA?
6      **Q.**  ADEA.  I always forget about --
7  ADEA discrimination cases.
8      **A.**  Compensation analyses in
9  age-discrimination cases?
10      **Q.**  Yes, ma'am.
11      **A.**  I have prepared compensation
12  analyses in age-discrimination cases.
13      **Q.**  On behalf of the plaintiff?
14      **A.**  I don't know.  I've worked on
15  hundreds of cases over the years, and I
16  would have to consult my files, to the
17  extent that they still exist, in order to
18  be able to even begin to answer that
19  question with any precision.
20      **Q.**  Can you give a best estimate of
21  how many cases?
22      **A.**  I can't.
23      **Q.**  Do you believe it's more than

Page 48

1  ten?
2      **A.**  Well, I have probably done
3  thousands of compensation analyses; some to
4  determine whether there was a difference in
5  compensation pay to similarly-situated
6  older and younger employees, some that are
7  to determine whether there are significant
8  differences in the amounts paid to male and
9  female employees, or differences between
10  various racial and ethnic groups.  I can't
11  sort out how many times I have prepared
12  compensation analyses where the issue
13  relates to a particular demographic group.
14      **Q.**  And you can't recall whether
15  these requests were made on behalf of a
16  plaintiff in those instances?
17      **A.**  On some occasions, they were --
18  I was retained by plaintiffs' counsel.
19      **Q.**  But you don't recall on how many
20  occasions you were retained by plaintiffs'
21  counsel?
22      **A.**  I don't.
23      **Q.**  Do you recall any other cases by

12  (Pages 45 to 48)

**American Court Reporting**
**August 23, 2010**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 49

1  name that you were retained by plaintiffs'
2  counsel?
3      **A.**  Where the allegation related
4  specifically to compensation and age?
5      **Q.**  Yes, ma'am.
6      **A.**  I can't answer that question off
7  the top of my head, but I will look to see
8  if there are any such cases on the list of
9  deposition and courtroom testimony 2006 to
10  2010 that is Appendix A to my report.
11      To the best of my recollection,
12  none of the cases that are listed in
13  Appendix A to my report are cases where I
14  gave testimony about compensation analyses
15  where the demographic group of interest was
16  older workers and that were prepared for
17  plaintiffs.
18      **Q.**  With regard to Appendix A, your
19  deposition and courtroom testimony, do you
20  recall -- and we can go through them one by
21  one.  Maybe that is the easiest way --
22  whether or not you were retained by the
23  plaintiff or the defendant in these cases

Page 50

1  cited?
2      **A.**  So do you want me to just go
3  down the list or --
4      **Q.**  Yes.  If you can -- for
5  example -- well, let's take the cases one
6  by one.  It might make a clearer record.
7      **A.**  Okay.
8      **Q.**  With regard to Dale Thomforde
9  v. IBM, United States District Court for
10  the District of Minnesota, Civil Number
11  0:02-CV-4817, were you retained by the
12  plaintiff or the defendant in this matter?
13      **A.**  I was retained by counsel for
14  defendant.
15      **Q.**  And do you recall what this case
16  concerned?
17      **A.**  That was a case in which
18  plaintiffs alleged age discrimination in
19  termination.
20      **Q.**  And did you prepare an expert
21  report in that case?
22      **A.**  My memory is that I did.
23      **Q.**  And do you recall what your

Page 51

1  analysis was?
2      **A.**  I prepared statistical analyses,
3  terminations by age group.
4      **Q.**  And I assume you submitted an
5  expert report --
6      **A.**  I believe so.
7      **Q.**  -- and that you were also
8  deposed?
9      **A.**  I was deposed.
10      **Q.**  And do you recall what the
11  outcome was of this case?
12      **A.**  I believe this case settled.
13      **Q.**  With regard to Mary Holmes
14  v. John E. Potter, Postmaster; EEOC, Denver
15  Office, EEOC File Number 320-2001-08187, do
16  you recall if you were retained on behalf
17  of the plaintiff or the defendant -- or,
18  maybe in this case, was it the respondent?
19      **A.**  I was retained by counsel for
20  Johnny Potter, Postmaster General of the
21  U.S. Postal Service.
22      **Q.**  And do you recall what this case
23  concerned?

Page 52

1      **A.**  My memory is that the
2  plaintiffs, or claimants, alleged
3  discrimination against women in the
4  assignment of performance ratings.
5      **Q.**  And did you prepare an analysis
6  for this case?
7      **A.**  I did.
8      **Q.**  And what was your analysis?
9      **A.**  I prepared a statistical
10  analysis of performance ratings by age
11  group -- I'm sorry -- by gender.
12      **Q.**  And do you recall what the
13  outcome was of this matter?
14      **A.**  I don't.  And it may not have
15  been determined.
16      **Q.**  With regard to George Powell
17  v. Carey International, United States
18  District Court for the Southern District of
19  Florida, Case Number 05-21395-CIV, do you
20  recall if you were retained by the
21  plaintiff or the defendant in this case
22  matter?
23      **A.**  I was retained by counsel for

13  (Pages 49 to 52)

**American Court Reporting**
**August 23, 2010**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 53

1 Carey International, Inc.
2    Q. And do you recall what this case
3 concerned?
4    A. This is a wage and hour case.
5    Q. And did you provide an analysis
6 in this case?
7    A. I did some analyses for this
8 matter.
9    Q. And do you recall what the
10 extent of your analysis concerned?
11    A. My work in that case, as I
12 remember it, was primarily to estimate the
13 value of alleged unpaid overtime hours --
14 or unpaid hours, I should say.
15    Q. And do you recall what the
16 outcome was of this case?
17    A. I don't know how to describe the
18 outcome. It was about to go to trial. And
19 what I am struggling with is I don't know
20 if the word "settled" is the right word,
21 but it did not proceed to trial. I think
22 most of the plaintiffs, quote, dropped out
23 of the case. And I don't know if they

Page 54

1 received any money as a part of a
2 settlement. So I just don't quite know how
3 to describe that outcome. It didn't go to
4 trial.
5    Q. And then with regard to James
6 Johnson, Bruce Moore, Christopher Ray
7 v. United States Beef Corporation in the
8 United States District Court for the
9 Western District of Missouri, were you
10 retained on behalf of the plaintiff or the
11 defendant?
12    A. I was retained by counsel for
13 United States Beef Corporation.
14    Q. And that would be the defendant?
15    A. Yes.
16    Q. And do you recall what the issue
17 was in this case?
18    A. Race discrimination in hiring.
19    Q. And do you recall what your
20 analysis concerned?
21    A. I prepared statistical analyses
22 of the racial composition of hires, I
23 believe, into select positions at an

Page 55

1 establishment owned and operated by United
2 States Beef Corporation.
3    Q. And do you recall what the
4 result of your analysis was in this matter?
5    A. My analyses showed that the
6 outcome of the hiring process at issue was
7 consistent with the result of a
8 decision-making system that was neutral
9 with respect to race.
10    Q. And do you recall what the
11 outcome of the case was in this matter?
12    A. I don't know the outcome of that
13 case.
14    Q. And it states here that you were
15 deposed. Did you prepare an expert report
16 as well?
17    A. I did.
18    Q. Okay. And with regard to
19 Douglas Powers, et al., v. U.S. Department
20 of Transportation; U.S. EEOC Commission,
21 Case Number 210-2002-6091X and
22 210-2002-06117X, do you recall whether you
23 were retained by the respondent or the

Page 56

1 claimant?
2    A. I was retained by counsel for
3 the U.S. Department of Transportation, the
4 respondent.
5    Q. And do you recall what the issue
6 was in this case?
7    A. My memory is that in this case
8 there were allegations of discrimination
9 against women and older employees.
10    Q. And did you prepare an analysis
11 in this case?
12    A. I did prepare some analyses in
13 this case, or I prepared a critique of
14 analyses that others had presented.
15    Q. Did you file an expert report in
16 this case?
17    A. I did.
18    Q. And you were deposed in this
19 case?
20    A. I was.
21    Q. And did you provide testimony at
22 the hearing?
23    A. I did.

14 (Pages 53 to 56)

**American Court Reporting**
**August 23, 2010**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 57

1  Q. And what was the summary of your
2  testimony; do you recall?
3      A. I don't recall specifically the
4  testimony that I gave in that case. My
5  memory is that I described my criticisms of
6  the analyses that the claimant's expert had
7  presented. And I believe that I testified
8  about the type of analyses that would need
9  to be conducted in order to specifically
10 address the age- and gender-discrimination
11 claims in that case.
12     Q. Do you recall what the outcome
13 was in this case?
14     A. I don't know the outcome.
15     Q. With regard to Marcela
16 Olvera-Morales, et al., v. International
17 Labor Management Corporation; North
18 Carolina Grower's Association; and Del-Al
19 Associates in the United States District
20 Court for the Middle District of North
21 Carolina, Civil Action 1:05-CV-559, do you
22 recall whether or not you were retained by
23 the plaintiff or the defendant in this

Page 58

1  matter -- defendants rather?
2      A. I was retained by counsel for
3  International Labor Management Corporation,
4  Inc., and North Carolina Grower's
5  Association, Inc., two of the defendants in
6  this case.
7      Q. Do you recall how many other
8  defendants were in this matter?
9      A. There is at least one other one.
10 There may be others.
11     Q. And do you recall what this case
12 concerned?
13     A. There were allegations of
14 discrimination against women in this case.
15     Q. And do you recall what your
16 analysis concerned?
17     A. I prepared statistical analyses
18 of the gender composition of workers in
19 select jobs to Mexican census data for
20 relevant occupations.
21     Q. And do you recall the results of
22 your analysis?
23     A. I certainly don't recall any of

Page 59

1  the specifics of those analyses. My memory
2  is that the data showed that female
3  representation in the jobs of interest was
4  consistent with or greater than what the
5  Mexican census data would suggest.
6      Q. Do you recall the outcome of
7  this case?
8      A. I don't know the outcome of this
9  case.
10     Q. With regard to Brian Thompson,
11 et al., v. Northrop Grumman Ship Systems,
12 United States District Court, Southern
13 District of Mississippi, Civil Action
14 Number 1:01CV111GR, do you recall if you
15 were retained by the plaintiff or the
16 defendant in this matter?
17     A. I was retained by counsel for
18 Northrop Grumman Ship Systems, Inc., the
19 defendant.
20     Q. And do you recall what this case
21 concerned?
22     A. In this case, there were
23 allegations of race discrimination.

Page 60

1      Q. Do you know with regard to what?
2      A. My memory is that there were
3  multiple issues. The primary issues were
4  promotion and pay.
5      Q. And do you recall -- did you
6  prepare an expert report in this matter?
7      A. Yes, I did.
8      Q. And were you deposed in this
9  matter?
10     A. I was.
11     Q. And do you recall what analysis
12 you performed in this matter?
13     A. I recall having prepared
14 statistical analyses of promotions and
15 statistical analyses of compensation.
16     Q. And do you recall what your
17 analysis showed?
18     A. I'm trying to think about
19 whether or not this case is under seal --
20     Q. Okay.
21     A. -- or covered by a protective
22 order. Some of them are; some of them
23 aren't. And I don't know about this one,

15 (Pages 57 to 60)

**American Court Reporting**
**August 23, 2010**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 61

1  so I'm reluctant to describe anything that
2  I did in any way other than very general
3  terms.
4      **Q.**  Okay.  Based upon your
5  knowledge, do you know what your
6  analysis -- your final analysis was in this
7  matter?
8          MS. MCGAHEY:  Objection to the
9  form.  Answered and answered.
10     **A.**  I'm sorry.  Would you repeat it?
11     **Q.**  Do you know what your final
12  analysis was with regard to this case, or
13  is it your testimony the case is under
14  seal?
15     **A.**  I don't know if it's under seal
16  but, because I don't know, I'm reluctant to
17  talk about it.  But I can tell you that my
18  report described statistical analyses of
19  promotions and statistical analyses of
20  compensation.
21     **Q.**  And do you recall whether or not
22  your determination concluded that there was
23  any improprieties with regard to

Page 62

1  promotions?
2      **A.**  I don't know that I would
3  describe it as improprieties.  The analyses
4  that were included in my report did not
5  reveal any patterns, as I recall it, that
6  would suggest that African-Americans had
7  outcomes different than what the neutral
8  model would predict.
9      **Q.**  And do you recall the outcome of
10  this matter?
11     **A.**  My understanding is that this
12  matter proceeded as 80-some-odd individual
13  arbitrations.  I know that some of those
14  arbitration sessions have taken place, but
15  I don't know the status of any of the
16  individual cases.
17     **Q.**  With regard to Serrano v. Cintas
18  Corporation and Blanca Nelly Avalos, et
19  al., v. Cintas Corporation, United States
20  District Court in the Eastern District of
21  Michigan, Southern Division, Case Number
22  04-CV-40132 and Case Number 06-CV-12311, do
23  you recall whether or not you were retained

Page 63

1  by the plaintiff or defendants in this
2  matter?
3      **A.**  I am retained by counsel for
4  Cintas Corporation, the defendant.
5      **Q.**  And do you recall what the
6  substance of this case concerned?
7      **A.**  Yes.
8      **Q.**  And what did it concern?
9      **A.**  There were allegations of
10  discrimination against women,
11  African-Americans, and Hispanics in
12  selection for hire for the service sales
13  representative position.
14     **Q.**  And did you file an expert
15  report in this matter?
16     **A.**  Yes.
17     **Q.**  And you were deposed as well?
18     **A.**  Yes.
19     **Q.**  And do you recall what your
20  analysis pertained to?
21     **A.**  Yes.
22     **Q.**  And what was your analysis?
23     **A.**  I prepared statistical analysis

Page 64

1  of the gender, racial, and ethnic
2  composition of hires into the service sales
3  representative position.
4      **Q.**  And do you recall what your
5  findings were?
6      **A.**  This case is under seal, and I
7  am not at liberty to discuss any specifics
8  of my analyses for that matter.
9      **Q.**  Okay.  And is the case still
10  ongoing, or do you know if it's been
11  resolved -- the cases rather?
12     **A.**  I know that both the Serrano and
13  the Avalos -- in the Serrano and Avalos
14  matter, class certification was denied.
15  The EEOC is pursuing some individual claims
16  in -- I believe it's the Serrano matter.
17  And those issues have not been resolved, to
18  my knowledge.
19     **Q.**  With regard to Edward Kinnally
20  v. Rogers Corporation, United States
21  District Court for the State of Arizona,
22  Case Number CV06-2704-PHX-JAT, do you
23  recall whether you were retained by the

16  (Pages 61 to 64)

**American Court Reporting**
**August 23, 2010**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 65

1 plaintiff or defendant in this matter?
2     **A.**   I was retained by counsel for
3 Rogers Corporation, the defendant.
4     **Q.**   And do you recall what this case
5 concerned?
6     **A.**   This is an age-discrimination
7 case.
8     **Q.**   And do you recall what the
9 specific allegations were?
10     **A.**   Plaintiffs alleged
11 discrimination against older employees in
12 selection for reduction in force.
13     **Q.**   And did you prepare an expert
14 report in this case?
15     **A.**   I did.
16     **Q.**   And you were deposed?
17     **A.**   I was.
18     **Q.**   And do you recall what your
19 analysis concerned?
20     **A.**   I prepared statistical analyses
21 that compared the age composition of
22 individuals who were selected for reduction
23 in force to older worker representation in

Page 66

1 the candidate pool.
2     **Q.**   And do you recall what your
3 findings were in this case?
4     **A.**   The data failed to reveal a
5 pattern of overselection of older workers
6 for reduction in force.
7     **Q.**   And do you know if this case has
8 been resolved?
9     **A.**   I don't.
10     **Q.**   With regard to Turner v. Comair,
11 et al., Untied States District Court,
12 Eastern District of Kentucky, Central
13 Division of Lexington, Case Number
14 5:07-CV-00037-KSF, were you retained by the
15 plaintiff or the defendant?
16     **A.**   I was retained by counsel for
17 the estate of Larry Turner.
18     **Q.**   So you were retained on
19 behalf -- by the plaintiff -- or the
20 estate?
21     **A.**   The estate. And this is a
22 wrongful death case, and so I never know
23 what the proper terminology is for the

Page 67

1 parties.
2     **Q.**   Okay. And do you recall -- you
3 stated it was a wrongful death case. Can
4 you be any more specific than that -- what
5 it concerned?
6     **A.**   What the wrongful death --
7     **Q.**   Yes, ma'am.
8     **A.**   -- or what was the cause of the
9 wrong death?
10     **Q.**   Yes, ma'am.
11     **A.**   A plane crash in Lexington,
12 Kentucky.
13     **Q.**   And do you recall what the
14 summary of your analysis was?
15     **A.**   I prepared analyses of
16 Mr. Turner's likely income and benefits
17 from employment had he not been killed in
18 this tragic accident.
19     **Q.**   And you filed an expert report;
20 correct?
21     **A.**   I did.
22     **Q.**   And do you know the result of
23 this case?

Page 68

1     **A.**   It settled.
2     **Q.**   And do you recall the summary of
3 your findings or what your findings
4 entailed?
5     **A.**   My findings entailed values of
6 the lost income and benefit stream over the
7 remainder of Mr. Turner's work life "but
8 for" this accident.
9     **Q.**   With regard to CNN America and
10 Team Videos, et al. -- well, let me strike
11 that.
12         In regard to the CNN America and
13 Team Video Services, Joint Employers and
14 National Association of Broadcast Employees
15 & Technicians, Communication Workers of
16 America, Local 31, AFL-CIO, Case Number
17 5-CA-31828, and CNN America and Team Video
18 Services, LLC, and National Association of
19 Broadcast Employees & Technicians,
20 Communication Workers of America, Local 11,
21 AFL-CIO, Case 5-CA-331125, United States of
22 America Before the National Labor Relations
23 Board, Region 5, do you recall whether you

17  (Pages 65 to 68)

**American Court Reporting**
**August 23, 2010**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 69

1 were retained by the respondents or the
2 complainants in this matter?
3    A.  This is an NLRB matter.  And so
4 in that setting, I don't know who gets
5 called -- what party goes by what name.  I
6 was retained by counsel for CNN America,
7 Inc.
8    Q.  The employer?
9    A.  CNN America is an employer, yes.
10   Q.  Okay.  You were not retained on
11 behalf of the Union?
12   A.  No.
13   Q.  Okay.  And I am assuming this is
14 an unfair labor charge?
15   A.  This case involved allegations
16 of discrimination against former Team Video
17 employees in the selection for hire by CNN.
18   Q.  And what was your analysis in
19 this case?
20   A.  I prepared statistical analyses
21 to determine whether former Team Video
22 employees were hired by CNN in numbers
23 consistent with their representation in the

Page 70

1 relevant applicant pools.
2    Q.  And I'm sorry.  I'm not hearing
3 you correctly.  Are you saying Team or
4 Teen?
5    A.  Team.
6    Q.  Okay.
7    A.  Team Video Services.
8    Q.  And do you recall what your
9 findings were?
10   A.  Former Team Video employees were
11 hired by CNN in numbers consistent with
12 their representation in the relevant
13 applicant pools.
14   Q.  Do you recall what the status of
15 this case is now?
16   A.  I don't know.
17      MS. RUCKER:  Can we go off the
18 record?
19      (Whereupon, an off-the-record
20 discussion was held.)
21      MS. RUCKER:  We can go back on
22 the record.
23   Q.  (BY MS. RUCKER)  Dr. Baker, with

Page 71

1 regard to Workers of America, Local 11,
2 AFL-CIO, Case 5 -- strike that.  We've
3 talked about that.
4      Dr. Baker, with regard to Sherry
5 McCarty v. John Potter, Postmaster General,
6 United States Post Office, Equal Employment
7 Opportunity Commission, LA District Office,
8 EEOC File 340-20005-00369x, Agency File
9 Number 1E-891-0004-99, were you retained on
10 behalf of the claimant or the respondent?
11   A.  I was retained by counsel for
12 the United States Postal Service, the
13 defendant.
14   Q.  And do you recall the substance
15 of this matter?
16   A.  This case involved allegations
17 of discrimination in selection for
18 promotion and temporary assignments.
19   Q.  And do you recall what your
20 analysis concerned?
21   A.  I prepared statistical analyses
22 of promotions and statistical analyses of
23 selection for temporary assignments.

Page 72

1    Q.  And do you recall what your
2 findings were?
3    A.  My memory is that there were no
4 statistically significant differences in
5 the demographic groups, promotion rates, or
6 in the rates at which they were selected
7 for temporary assignments.
8    Q.  And do you recall what the
9 current status of this matter is?
10   A.  I don't know the current status.
11   Q.  To your knowledge, it hasn't
12 been resolved?
13   A.  I don't know.
14   Q.  With regard to the EEOC v. CRST
15 Van Expedited, United States District
16 Court, Northern District of Iowa, Cedar
17 Rapids Division, Case Number 1:07-CV-95,
18 were you retained on behalf of the
19 plaintiff or the defendant in this matter?
20   A.  I was retained by counsel for
21 CRST Van Expedited, Inc., the defendant.
22   Q.  And do you recall what the
23 substance of this case concerned?

18  (Pages 69 to 72)

**American Court Reporting**
**August 23, 2010**

Page 73

1    **A.** This case involved allegations
2  of sexual harassment.
3    **Q.** And what was your analysis in
4  this case?
5    **A.** I prepared an analysis that
6  compared the gender composition of CRST
7  truck drivers to their availability in the
8  relevant external labor market.
9    **Q.** And do you recall what the
10  summary of your findings were?
11    **A.** My memory is that the data
12  showed that CRST employed females in truck
13  driver positions in either numbers
14  consistent with or greater than their
15  representation among truck drivers in a
16  particular industry.
17    **Q.** And the status of this case is?
18    **A.** I believe that it was dismissed
19  on summary judgment. My understanding is
20  that it is over, and CRST prevailed, but
21  I'm not sure how to describe the legal
22  situation that caused it to end.
23    **Q.** With regard to the Willard

Page 74

1  Eastin, et al., v. Entergy Corporation
2  matter in the 24th Judicial District for
3  the Parish of Jefferson, State of
4  Louisiana, Division A, Case Number 456-981,
5  were you retained on behalf of the
6  plaintiff or the defendant?
7    **A.** I was retained by counsel for
8  Entergy Corporation, the defendant.
9    **Q.** And do you recall what the
10  substance of this case concerned?
11    **A.** This is an age-discrimination
12  case.
13    **Q.** And do you recall any other
14  particulars regarding this case?
15    **A.** What would you like to know
16  about it?
17    **Q.** Was this an allegation
18  concerning promotion or RIF?
19    **A.** Terminations.
20    **Q.** And do you recall what your
21  analysis concerned in this case?
22    **A.** I don't recall in this case
23  whether I provided a critique of someone

Page 75

1  else's analysis or if I prepared
2  alternative analyses. I just don't recall
3  specifically.
4    **Q.** And you went to deposition in
5  this matter?
6    **A.** I was deposed in this matter.
7    **Q.** Now, I understand that this is a
8  state court matter, so I'm not sure whether
9  or not you had to file an expert report.
10  Do you recall filing an expert report in
11  this case?
12    **A.** I believe I did.
13    **Q.** And do you recall the outcome of
14  this case?
15    **A.** To my knowledge, it's not
16  resolved.
17    **Q.** With regard to the EEOC
18  v. Paramount Staffing case, United
19  States District Court, Western District
20  of Tennessee, Western Division, Civil
21  Action 2:06-CV-2624, were you retained on
22  behalf of the defendant or the plaintiff in
23  this matter?

Page 76

1    **A.** I was retained by counsel for
2  the Paramount Staffing, Inc., the
3  defendant.
4    **Q.** And do you recall what the
5  substance of this case concerned?
6    **A.** This is a race discrimination
7  case.
8    **Q.** And do you know specifically
9  regarding what issue of race
10  discrimination?
11    **A.** The employment practice at issue
12  was hiring.
13    **Q.** And what was your analysis in
14  this case?
15    **A.** I prepared statistical analyses
16  of the racial composition of individuals
17  selected for these temporary jobs.
18    **Q.** And do you recall what your
19  findings were in this matter?
20    **A.** I don't recall specifically.
21    **Q.** Do you know if this matter is
22  still ongoing?
23    **A.** My understanding is that it

19  (Pages 73 to 76)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 77

```
 1   settled last week -- or is in the process
 2   of settling.
 3       Q.  And with regard to the case
 4   EEOC v. Les Schwab Tire Centers of
 5   Washington, United States District Court,
 6   Western District of Washington at Seattle,
 7   Civil Action Number 06-045-RSM, were you
 8   retained by the plaintiff or the defendant?
 9       A.  I was retained by counsel for
10   Les Schwab Tire Centers, the defendant.
11       Q.  And do you recall what this case
12   concerned?
13       A.  This was a case in which the
14   EEOC alleged discrimination against women
15   in selection for a particular job title at
16   Les Schwab Tire Centers.
17       Q.  And in this case, did you
18   prepare an analysis?
19       A.  I personally did not prepare
20   analyses.
21       Q.  How would you characterize your
22   work in this case?
23       A.  My work in this case was to
```

Page 78

```
 1   describe the analyses that had been
 2   prepared by another social scientist.
 3       Q.  And do you recall what your
 4   findings were?
 5       A.  My recollection is that the
 6   study showed that women were employed in
 7   the relevant job in numbers consistent with
 8   or greater than their representation in the
 9   relevant external labor markets.
10       Q.  Did you prepare an independent
11   analysis or a critique in this matter?
12       A.  My role was to describe the
13   analyses that had been prepared by another
14   social scientist or statistician.
15       Q.  And was that social scientist or
16   statistician retained by plaintiffs or
17   defendants in this matter?
18       A.  The other person was retained by
19   defendants.
20       Q.  And you were brought in after
21   the initial social scientist?  Would that
22   be a fair characterization?
23       A.  Yes.
```

Page 79

```
 1       Q.  Do you know the status of this
 2   case?
 3       A.  I don't.
 4       Q.  Do you know whether or not there
 5   was any challenge to your report in this
 6   case?
 7       A.  I don't recall.  It wouldn't
 8   surprise me given that in virtually every
 9   case these days there is some challenge.
10   But let me clarify.  I did not prepare the
11   report.  I testified about the report, but
12   the report was authored by someone else.
13       Q.  When you say you "testified,"
14   did you testify in deposition, or did you
15   submit a supplementary expert report?
16       A.  I testified at deposition.  I
17   don't recall having authored a report.
18   Maybe I did.  And I will be happy to check
19   my records to see if, in fact, I did.  But
20   I was asked to describe the analyses that
21   were presented in a report that was
22   authored by someone else and to offer my
23   opinion about the appropriateness of those
```

Page 80

```
 1   studies.
 2       Q.  And to your knowledge, that case
 3   has not been resolved; correct?
 4       A.  I don't know if it has or not.
 5       Q.  With regard to the David
 6   Ojeda-Sanchez v. Bland Farms, United States
 7   District Court, Southern District of
 8   Georgia, Statesboro Division, Civil Action
 9   Number 6:08-096, were you retained by the
10   plaintiff or the defendant in this matter?
11       A.  I was retained by counsel for
12   Bland Farms, the defendant.
13       Q.  And do you know what this case
14   concerned?
15       A.  This is a wage and hour matter.
16       Q.  And do you know what the
17   specific allegations were in this case?
18       A.  Failure to pay for all hours
19   worked.
20       Q.  And what did your analysis
21   concern?
22       A.  In that case, I prepared a
23   critique of plaintiff's expert, and I don't
```

**American Court Reporting**
**August 23, 2010**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 81

1 recall whether I prepared any analyses or
2 not -- I did. I did, I believe, prepare
3 some analyses.
4   Q.  What were your findings based
5 upon your analysis?
6   A.  I'm trying to remember some of
7 the specifics of this case.  There were
8 some sampling issues in this case.  And I
9 believe I concluded that the plaintiff's
10 expert's sample was not random nor
11 sufficiently large enough to be
12 representative of the population that -- or
13 to which he intended to generalize.
14   Q.  And do you know the status of
15 this case?
16   A.  I don't.
17   Q.  With regard to Charlotte
18 Lachney v. Target, U.S. District Court,
19 Western District of Oklahoma, Civil Action
20 Number 06-1389, do you recall who retained
21 you?
22   A.  Counsel for Target Corporation,
23 the defendant.

Page 82

1   Q.  And do you know what this case
2 concerned?
3   A.  This is an age-discrimination
4 case.
5   Q.  And do you know the specific
6 allegations in this case?
7   A.  Plaintiffs alleged that older
8 workers were terminated in numbers greater
9 than would be expected given the
10 representation in the workforce and that
11 older workers were constructively
12 discharged.
13   Q.  And do you recall what the
14 subject of your analysis was in this case?
15   A.  I prepared statistical analyses
16 of terminations.
17   Q.  And do you recall what the
18 summary of your findings were?
19   A.  Not specifically.
20   Q.  Do you remember generally what
21 the findings of your analysis were?
22   A.  There was no statistical support
23 for the allegation that older workers were

Page 83

1 discharged or voluntarily terminated -- let
2 me start over.  I lost my train of thought.
3 I'm sorry.
4   Q.  That's all right.
5   A.  The analyses showed that older
6 workers were less likely to terminate than
7 their younger counterparts and that older
8 long-term employees were less likely to
9 terminate than their counterparts.
10   Q.  Do you know what the status of
11 this case is?
12   A.  It's ongoing.
13   Q.  And did you file an expert
14 report in this matter?
15   A.  I did.
16   Q.  And where you state that you
17 provided testimony, did you testify at
18 trial, or did you testify in a deposition?
19   A.  At a hearing.
20   Q.  And what was the nature of the
21 hearing?
22   A.  I don't know how to describe it.
23 I suppose you would technically describe it

Page 84

1 as a Daubert hearing.
2   Q.  And you testified this case is
3 still ongoing; correct?
4   A.  Yes.
5   Q.  Other than the cases that we
6 have discussed, have you testified in any
7 other matter in the last three years?
8   Q.  In the last three years?
9   Q.  Yes, ma'am.
10   A.  Well, I hope not, because I
11 intended this list that is a part of
12 Appendix A to my report to be complete, but
13 that's not to say that I have inadvertently
14 left one off.
15   Q.  Do you recall whether or not you
16 inadvertently left any cases off?
17   A.  No.  I intended this to be a
18 complete list, but that's not to say that I
19 failed to record one soon after it
20 happened.
21   Q.  To your knowledge, did you
22 testify in any other case?
23   A.  Not to my knowledge.

21 (Pages 81 to 84)

**American Court Reporting**
**August 23, 2010**

**American Court Reporting**
**toll-free (877) 320-1050**

1    MS. RUCKER:  We can take a short
2 break now.
3         (Whereupon, a brief recess was
4 taken at 11:21 a.m., and the deposition
5 reconvened at 11:35 a.m.)
6    MS. RUCKER:  We can go back on
7 the record.
8    Q.  (BY MS. RUCKER) Dr. Baker, we
9 went through a pretty exhaustive list of a
10 number of cases that you have provided
11 expert-witness services.
12         Would it be a fair description
13 that in the cases that we've discussed that
14 your primary work was to provide a critique
15 as supposed to an initial analysis of
16 information?
17    MS. MCGAHEY:  Objection to the
18 form.
19    A.  In most of these cases, I did
20 provide a critique of analyses that have
21 been prepared by others.  In most of them,
22 I offered alternative analyses that I
23 believed to be more appropriate.

1    Q.  Dr. Baker, I observe in your
2 resumé that you have a number of
3 publications and research papers.  And I
4 don't want to go through each one of them,
5 per se, however, can you identify from the
6 list any of the publications that have been
7 peer-reviewed?
8    A.  I would describe the first entry
9 on page 2 of my CV, which is Appendix A to
10 my report, in the section "Publications and
11 Research Papers," the first entry,
12 "Compensation Analysis," which is a chapter
13 in a book titled "The Human Resources
14 Program Evaluation Handbook" was
15 peer-reviewed.  The others were not.
16    Q.  Have you ever had a publication
17 or research paper that was double
18 peer-reviewed?
19    A.  No, I have never submitted such
20 a paper.
21    Q.  With regard to the presentations
22 that you testified that you made, would you
23 describe in most instances -- were you

1 approached regarding speaking, or did you
2 submit a resumé or an application to be a
3 presenter?
4    A.  Let me start with -- some of
5 these presentations are at seminars that
6 are sponsored by ERS Group, our company.
7    Q.  Okay.
8    A.  Okay.  So let's set those aside.
9 The others -- if you will just give me a
10 minute to glance over them.
11         Most of the presentations that
12 are shown here are -- I was invited by the
13 group that was hosting the seminar to
14 speak.  In some cases, I submitted a
15 proposal for a presentation, and it was
16 selected.  For example, about the middle of
17 page 3 of my CV, it's a presentation where
18 I was invited by the National Industry
19 Liaison Group to prepare a presentation on
20 "Compensation Self-analyses from the
21 Perspective of an Attorney and a Labor
22 Economist."  I submitted a proposal to make
23 such a presentation, and it was accepted.

1         About the middle of page 4 of my
2 CV is a presentation that I gave with my
3 colleague Dr. Joshua Gotkin at the Southern
4 Economic Association Annual Conference.  In
5 1996 I submitted the paper, and it was
6 accepted to be presented as part of the
7 program.
8         And just a little bit below that
9 one is a paper that I presented at the
10 Southern Economic Association Annual
11 Conference in 1994, "Statistical Analyses
12 of Employment Practices in a Recent
13 Innovative Consent Decree."  I submitted
14 that paper for presentation at this
15 conference, and it was accepted.
16         There's a possibility that I
17 also submitted for presentation a paper
18 called "Dollars and Sense:  Quantifying and
19 Managing Employment Decisions" to the
20 American Association of -- or it should be
21 "for" Affirmative Action.
22    Q.  I'm sorry.  Can you state that
23 one again?

**American Court Reporting**
**August 23, 2010**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 89

1  A. This is page 4, fourth from the
2  bottom.
3  Q. Okay. "Dollars and Sense."
4  Okay.
5  A. My memory is that I submitted a
6  proposal to make a presentation on this
7  subject.
8  Q. And you said it should be "for
9  Affirmative Action"; correct?
10  A. Right.
11  Q. Dr. Baker, with regard to your
12  fee, what is your fee arrangement for
13  providing testimony today?
14  I understand that you didn't
15  bring any invoice, but what is your fee
16  arrangement with regards to providing
17  expert testimony?
18  A. My understanding is that you are
19  paying for my time by the hour.
20  Q. And what is your fee?
21  A. I don't recall specifically.
22  It's in the documents that I've produced.
23  It may be $427.50 an hour, but we can

Page 90

1  confirm that with the documents that I
2  brought today.
3  Q. And do you have a contract with
4  Bradley, Arant & Boult regarding your
5  expert-witness fee?
6  A. I wouldn't describe it as a
7  contract. I have an engagement letter that
8  I signed and that Mr. Tim Williams signed.
9  Q. And who is Mr. Williams?
10  A. My understanding is that he is
11  in-house counsel for Winn-Dixie, Inc.
12  MS. RUCKER: If we can go off
13  the record for just a second.
14  (Whereupon, an off-the-record
15  discussion was held.)
16  MS. RUCKER: We can go back on
17  the record.
18  Q. (BY MS. RUCKER) Dr. Baker,
19  I'm looking at a series of e-mails and
20  correspondence as Bates Number 4576
21  through 4598. I am going to turn your
22  attention to -- I will call this
23  Plaintiff's Exhibit C. Being this was

Page 91

1  produced today, I only have one copy. And
2  to expedite things, if we can just -- you
3  can just refer to it.
4  A. Sure.
5  (Whereupon, a document was
6  marked as Plaintiff's Exhibit Number C and
7  is attached to the original transcript.)
8  Q. Dr. Baker, I ask that you turn
9  your attention to Bates Number 495.
10  MS. MCGAHEY: To which number?
11  MS. RUCKER: 498.
12  MS. MCGAHEY: 4595?
13  MS. RUCKER: I'm sorry. Maybe I
14  misread it. 4595 to 4598.
15  Q. Dr. Baker, is that a true and
16  accurate copy of the engagement letter you
17  signed with Winn-Dixie Stores, Inc.?
18  MS. MCGAHEY: Objection to the
19  form. The document speaks for itself as to
20  what company was represented -- or what
21  company executed this engagement letter.
22  Q. You can answer.
23  A. This is the engagement letter

Page 92

1  that I signed and that Mr. Tim Williams
2  signed on behalf of Winn-Dixie Montgomery,
3  LLC.
4  Q. If I can have a look at that.
5  Sorry to have to go back and forth.
6  Exclusive of this letter, are
7  there any other contracts that you have for
8  expert-witness services with Winn-Dixie
9  Montgomery, LLC?
10  A. I'm not aware of any others.
11  Q. Did you sign any engagement
12  letter with Winn-Dixie Stores, Inc.?
13  A. Not that I recall.
14  Q. Would it be -- I'm sorry.
15  A. I may have. When I prepared
16  this letter, I don't recall initially what
17  I had below the line on which Mr. Williams
18  ultimately signed. But there is no letter
19  with his signature, as well as mine, other
20  than the one that you have marked as
21  Plaintiff's Exhibit C.
22  Q. Are you providing an expert
23  report on behalf of Winn-Dixie Stores,

23  (Pages 89 to 92)

**American Court Reporting**
**August 23, 2010**

# American Court Reporting
## toll-free (877) 320-1050

Page 93

1    Inc.?
2        MS. MCGAHEY:  Objection to the
3    form.
4        A.   My understanding is that I am
5    engaged by Winn-Dixie Montgomery, LLC.
6        Q.   And per terms of the engagement
7    letter, is your hourly fee 427 an hour?
8        A.   The rate at which ERS Group
9    bills my time is $427.50 per hour.
10       Q.   Dr. Baker, do you recall when
11   you were first contacted by Winn-Dixie
12   regarding this matter?
13       A.   My memory is that it was in
14   early June of this year.
15       Q.   Do you recall what date?
16       A.   I don't.
17       Q.   Do you recall who first
18   contacted you regarding this matter?
19       A.   My recollection is that first I
20   received a phone call from Andrea Robinson.
21       Q.   And do you recall who Andrea
22   Robinson was employed by or is employed by?
23       A.   I don't know the Winn-Dixie

Page 94

1    legal entity by whom Ms. Robinson is
2    employed, but she is a paralegal employed
3    by Winn-Dixie.
4        Q.   And when Ms. Robinson first
5    contacted you, what was the substance of
6    your conversation with Ms. Robinson?
7        A.   My memory is that we had a brief
8    conversation.  She asked me if I would be
9    available to provide expert services in
10   this case and, if so, if I was interested.
11       Q.   Did she explain the nature of
12   the expert services you were to provide or
13   were likely to provide?
14       A.   Not in any detail.
15       Q.   What did she say exactly
16   regarding the expert services?
17       A.   I don't recall.
18       Q.   When you first spoke with
19   Ms. Robinson, did you voice any opinion
20   regarding this case?
21       A.   No.
22       Q.   Did Ms. Robinson outline any
23   facts or legal theories regarding this

Page 95

1    case?
2        A.   Not that I recall.
3        Q.   Did she talk at all about the
4    substance of the complaint with you during
5    this conversation?
6        A.   I don't recall any of the
7    specifics of the conversation that I had
8    with Ms. Williams (sic).  I believe that
9    she told me the style of the case and that
10   the allegation was age discrimination.
11       Q.   And when you stated
12   "Ms. Williams," did you mean
13   Ms. Robinson?
14       A.   That's right, Ms. Robinson, I'm
15   sorry.
16       Q.   Did you ask Ms. Robinson for any
17   information at this point?
18       A.   I don't recall specifically.  I
19   probably asked her for a copy of the
20   complaint so that I could become more
21   familiar with the specifics of the case.
22       Q.   Do you recall when Ms. Robinson
23   provided you a copy of the complaint?

Page 96

1        A.   I don't recall who actually sent
2    me the copy of the complaint, but I believe
3    it was not too long after I was first
4    contacted about the case.
5        Q.   Did you bring a copy of the
6    complaint that she sent you in this case?
7        A.   It's in my file, yes.
8        Q.   Dr. Baker, I'm going to show
9    you what will be marked as Plaintiff's
10   Exhibit D.
11       A.   Okay.
12           (Whereupon, a document was
13   marked as Plaintiff's Exhibit Number D and
14   is attached to the original transcript.)
15       Q.   And there are numerous pages
16   that are Bates stamped in this exhibit.
17           You'll note that the e-mail,
18   which is the first page, I believe, it's
19   Bates stamped 4375 --
20       A.   Correct.
21       Q.   -- and it's dated June 7, 2010?
22       A.   Correct.
23       Q.   Was that the date that

24  (Pages 93 to 96)

## American Court Reporting
## August 23, 2010

Page 97

1  Ms. Robinson first contacted you?
2      **A.**  I don't recall.
3      **Q.**  Is it possible that you may have
4  had conversation with her prior to June 7,
5  2010?
6      **A.**  That's certainly possible, and I
7  just don't -- I remember it was early June.
8  I don't know if it was before June the 7th
9  or not.
10     **Q.**  And, Dr. Baker, that's an e-mail
11 that you sent to Ms. Robinson, is that not
12 correct?
13     **A.**  No.  This is an e-mail message
14 that Ms. Robinson sent to me.
15     **Q.**  Okay.  If I can look at the
16 exhibit again.
17         Dr. Baker, if I could turn your
18 attention to Bates label 4376.  And I
19 believe that document goes through -- is it
20 475?
21     **A.**  4403.
22     **Q.**  Are those the responsive
23 documents that you sent to Ms. Robinson as

Page 98

1  it pertained to her June 7th e-mail?
2      **A.**  Yes.
3      **Q.**  Dr. Baker, if I could turn your
4  attention to Bates Number 4381 through
5  4386.  Listed in that series of Bates-range
6  documents, there are a number of cases
7  titled "Testimony."  If you can take a
8  minute to look through them.
9          Are those all cases you
10 personally testified in?
11     **A.**  These are cases -- it should be
12 a list of all cases in which I have given
13 oral testimony.  There are some entries
14 that are cases where I submitted an
15 affidavit or a declaration or a report that
16 I knew became a part of the case record.
17 But this does not contain a complete list
18 of all affidavits and declarations that --
19 or reports that I have prepared.
20     **Q.**  And that list differs from the
21 list contained in your expert report based
22 on the fact that this list contains
23 affidavits and declarations?

Page 99

1      **A.**  Correct.  In addition, it covers
2  a much longer time period than what's shown
3  at Appendix A to my report in this case.
4      **Q.**  Without going through every
5  case -- I promise you I won't take you
6  through every case -- are there any
7  instances in which you've provided an
8  affidavit, declaration, testimony, an
9  expert report on behalf of a plaintiff?
10         MS. MCGAHEY:  Objection to the
11 form.
12     **A.**  And you are talking about that
13 are on this list?
14     **Q.**  That are on that list.
15     **A.**  The first entry on this list,
16 Mary Ann Braswell v. Tallahassee Community
17 College, I was retained by counsel for
18 Ms. Braswell.
19     **Q.**  And do you recall what that case
20 concerned?
21     **A.**  Now, this one was a really
22 long time ago.  I believe it was an
23 employment-discrimination case.  And it

Page 100

1  involved a hiring issue.
2      **Q.**  And the date of that case is
3  1990; is that correct?
4      **A.**  I don't know.
5      **Q.**  Okay.
6      **A.**  It was many years ago.
7          I was retained by plaintiff in
8  Betty L. Sanders v. The Ceridian
9  Corporation.
10     **Q.**  And do you recall what that case
11 concerned?
12     **A.**  That was an employment-
13 discrimination case, and the issue was
14 termination.
15     **Q.**  And do you recall the nature of
16 what service you provided in that case?
17     **A.**  I prepared statistical analyses.
18     **Q.**  And do you recall the date of
19 that case?
20     **A.**  I don't.
21         Rhonda Smith v. Bally
22 Scandinavian Health Clubs is a case in
23 which I was retained by counsel for

25  (Pages 97 to 100)

Page 101

1 plaintiff.
2     Q. And do you recall what that case
3 concerned?
4     A. I prepared economic loss
5 estimates.
6     Q. Do you recall whether that case
7 was a discrimination case?
8     A. I believe the specific issue was
9 retaliation.
10     I was retained by plaintiff in
11 Donald W. Miller v. Computing Devices
12 International.
13     Q. And do you recall when that case
14 was?
15     A. I don't.
16     Q. And do you recall the substance
17 of that case?
18     A. My memory is that it was an age
19 discrimination in selection for termination
20 case.
21     I was retained by plaintiff in
22 James Leon Foster v. Jackson County,
23 Florida.

Page 102

1     Q. And do you recall what that case
2 concerned?
3     A. My recollection is that it was a
4 breach-of-contract case.
5     Q. And do you recall what the
6 subject of your analysis was?
7     A. I prepared estimates of economic
8 loss.
9     I was retained by plaintiffs in
10 Kane, et al., v. Sandy Freedman, Mayor of
11 the City of Tampa and the City of Tampa,
12 Florida.
13     Q. And do you recall what that case
14 concerned?
15     A. Plaintiffs in this case were
16 challenging the City of Tampa's use of an
17 affirmative action plan. I believe that
18 there were also allegations of
19 discrimination and promotions.
20     Q. And do you recall what your
21 analysis concerned?
22     A. I prepared analyses of
23 promotions, I believe. And it involved

Page 103

1 either the police department or the fire
2 department. I don't recall specifically.
3     Q. Do you recall when that case
4 was?
5     A. I don't.
6     Q. Was it more than 20 years ago?
7     A. No.
8     I was retained by plaintiffs in
9 Fanning and Chu-Wong v. Good Counsel High
10 School.
11     Q. Do you recall what that case
12 concerned?
13     A. I believe the issue was
14 discrimination in the establishment of
15 starting salaries.
16     Q. And do you recall what your
17 analysis was in that case?
18     A. I don't.
19     Q. Do you recall when that case
20 was?
21     A. I don't.
22     Q. Was it more than ten years ago?
23     A. Could be.

Page 104

1     Q. Could it be more than 20 years
2 ago?
3     A. No.
4     I was retained by plaintiffs in
5 Alan D. Brooks, et al., v. GTE Florida,
6 Inc.
7     Q. Do you recall what that case
8 concerned?
9     A. My recollection is that this was
10 an age-discrimination case.
11     Q. And what type of analysis did
12 you perform?
13     A. I don't recall.
14     Q. And do you recall if this case
15 is more than ten years old?
16     A. I don't know.
17     I was retained by plaintiffs in
18 Atchley, et al., v. The City of Atlanta,
19 Georgia.
20     Q. And do you recall what that case
21 concerned?
22     A. My memory is that it was an
23 employment-discrimination case, and I

26  (Pages 101 to 104)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 105

1  believe the issue was promotion.
2      Q. And do you recall the date of
3  that case?
4      A. I don't.
5          I was retained by plaintiff's
6  counsel in Thaddeus M. Korbin -- that's
7  K-O-R-B-I-N -- v. Public Service Company of
8  New Mexico.
9      Q. And do you recall when that case
10 was?
11     A. I don't.
12     Q. And do you recall what the
13 nature of that case concerned?
14     A. My memory is that Mr. Korbin
15 alleged discrimination in terminations.
16     Q. And do you recall what your
17 analysis concerned in that case?
18     A. I prepared statistical analyses,
19 the demographic composition of individuals
20 who were terminated. My memory on that one
21 is a bit fuzzy.
22     Q. And do you think that case is
23 more than ten years old?

Page 106

1      A. I doubt it.
2          I was retained by the Estate of
3  Larry Turner in Turner v. Comair, Inc., et
4  al. We've talked about that one already
5  today.
6      Q. That was a wrongful death?
7      A. Yes.
8      Q. Okay.
9      A. Or at least that is how I would
10 characterize it. I don't know if
11 technically that's the legal terminology
12 you would use.
13     Q. Other than the documents
14 contained therein, did you provide any
15 other information to Ms. Robinson in
16 response to her June 7th e-mail?
17     A. Not that I recall. But if I
18 did, it is in the documents that I have
19 produced to you.
20     Q. Were you contacted by anyone
21 else from Winn-Dixie regarding providing
22 expert-witness services in this case other
23 than Ms. Robinson or Mr. Williams?

Page 107

1      A. I don't think so.
2      Q. When were you first contacted by
3  Bradley, Arant, Boult & Cummings?
4      A. Some days after my conversation
5  with Ms. Robinson.
6      Q. And who initiated the contact?
7      A. I believe I had a phone call
8  with John Smith T.
9      Q. Do you recall the date of that
10 phone call?
11     A. I don't.
12     Q. And what did he state during
13 that conversation?
14     A. He told me that he was
15 representing Winn-Dixie Montgomery, LLC, in
16 this case.
17     Q. Did he tell you anything
18 regarding the case, EEOC v. Winn-Dixie?
19     A. My recollection is that he gave
20 me a brief description of the issue.
21     Q. And what did he describe was the
22 issue?
23     A. That Mr. Bradberry alleged age

Page 108

1  discrimination in his nonselection for the
2  center-store-manager job.
3      Q. Did he tell you any other legal
4  theories concerning the case?
5      A. No.
6      Q. Did he tell you any other facts
7  about the case?
8      A. Not that I recall. I believe
9  that he told me he either had or expected
10 to soon receive the EEOC's expert report in
11 this case.
12     Q. Did you all talk about the scope
13 of work if you were retained as an expert
14 in this case?
15     A. We talked about the fact that I
16 would review and evaluate EEOC's expert's
17 report that was submitted in this case, and
18 I would offer my opinion about the
19 information set forth in that report, and
20 that, if appropriate, I would prepare
21 alternative analyses.
22     Q. Did you discuss a fee
23 arrangement at all with Mr. Smith T

27 (Pages 105 to 108)

**American Court Reporting**
**August 23, 2010**

# American Court Reporting
## toll-free (877) 320-1050

Page 109

1  during this conversation?
2      A.  No, not that I recall.
3      Q.  Did you request any documents
4  from Mr. Smith T regarding -- during this
5  conversation?
6      A.  We talked about my receipt of
7  the EEOC's expert report.  I probably told
8  him that I would also like to receive the
9  documents upon which EEOC's expert relied
10  to prepare his report in this case.  This
11  wouldn't have been necessarily all in that
12  conversation -- that phone conversation
13  that I had with Mr. Smith T, but around
14  that same time.
15      Q.  Did you offer Mr. Smith T any
16  opinion regarding the case -- your
17  opinion --
18      A.  During that phone conversation?
19      Q.  Yes, ma'am.
20      A.  No, because at that time I had
21  not received Dr. LaJeunesse's report.
22      Q.  But you had already received the
23  complaint; isn't that correct?

Page 110

1      A.  I can't recall the order in
2  which things happened.  That's possible.
3      Q.  Isn't it possible or didn't you
4  previously testify that Ms. Robinson had
5  provided you a copy of the complaint?
6      MS. MCGAHEY:  Objection to the
7  form.
8      A.  I don't know -- I believe that I
9  asked her for a copy of the complaint.  I
10  don't recall specifically who sent it to
11  me, but you will be able to ascertain that
12  from the documents that I have produced.
13      Q.  Dr. Baker, I'm going to show
14  you what will be marked as Plaintiff's
15  Exhibit E.
16      A.  Okay.
17      (Whereupon, a document was
18  marked as Plaintiff's Exhibit Number E and
19  is attached to the original transcript.)
20      Q.  Is this a true and accurate copy
21  of the expert disclosure you received from
22  Mr. Smith T?
23      A.  It appears to be.

Page 111

1      Q.  At this time did Mr. Smith T or
2  anyone else from Bradley Arant provide you
3  with any additional documents?
4      A.  Well, in that e-mail message, in
5  addition to the EEOC's expert disclosure, I
6  was also provided a copy of the first
7  amended complaint.
8      Q.  And, Dr. Baker, I'm going to
9  show you what will be marked as Plaintiff's
10  Exhibit F.
11      A.  Okay.
12      (Whereupon, a document was
13  marked as Plaintiff's Exhibit Number F and
14  is attached to the original transcript.)
15      Q.  And I will show you what will be
16  marked as Plaintiff's Exhibit G.
17      A.  Okay.
18      (Whereupon, a document was
19  marked as Plaintiff's Exhibit Number G and
20  is attached to the original transcript.)
21      Q.  Is that true and accurate copies
22  of documents that you received from
23  Bradley, Arant & Boult through their

Page 112

1  representative Pamela Parsons?
2      A.  This is the answer to the
3  complaint that Ms. Parsons e-mailed to me.
4      Q.  And I am going to show you what
5  will be marked as Plaintiff's Exhibit H.
6      (Whereupon, a document was
7  marked as Plaintiff's Exhibit Number H and
8  is attached to the original transcript.)
9      Q.  Dr. Baker, the exhibits, I
10  believe, C through G, were all documents
11  you were provided prior to your executing
12  the engagement letter with Winn-Dixie for
13  expert services; would that be a fair
14  characterization?
15      MS. MCGAHEY:  Objection to the
16  form.
17      A.  I received Exhibits F, G, and H
18  on June 11, 2010.  And the first engagement
19  letter that I sent to Tim Williams was on
20  June 14, 2010.
21      Q.  Prior to sending Mr. Williams
22  the engagement letter on June 14th, had you
23  had an opportunity to review Plaintiff's

28  (Pages 109 to 112)

## American Court Reporting
## August 23, 2010

**American Court Reporting**
**toll-free (877) 320-1050**

Page 113

1 Exhibits F, G, and H?
2     A.  I expect that I reviewed them.
3     Q.  Do you have a more definitive
4 answer than you expect?  Did you review
5 them?
6     A.  Well, I probably -- I can't tell
7 you precisely the day or time of day that I
8 first looked at these exhibits.  I expect
9 that I looked at them the day that I
10 received them.
11     Q.  And prior to entering into or
12 sending the June 14th engagement letter,
13 did you give Mr. Williams a preliminary
14 assessment of the case?
15     A.  No.
16     Q.  Did you give anyone -- any
17 attorney from Bradley, Arant & Boult a
18 preliminary opinion regarding the
19 assessment of the case prior to your
20 engagement letter?
21     A.  Not that I recall.
22     Q.  Did you express any doubts or
23 reservations to Mr. Williams prior to

Page 114

1 entering into an engagement -- prior to
2 executing the engagement letter regarding
3 the case?
4     A.  Any doubts regarding the case?
5     Q.  Yes.
6     A.  Doubts about what?
7     Q.  Doubts about providing an expert
8 report, whether or not you could provide an
9 expert report.
10     A.  Well, I told him that I would be
11 available to provide an expert report.
12     Q.  Did you prepare any draft expert
13 reports prior to submitting a final expert
14 report?
15     A.  Yes.
16     Q.  Are those drafts contained in
17 the information you provided today?
18     A.  Yes, they are.
19     Q.  And do you recall how many
20 drafts you prepared?
21     A.  There are at least two, possibly
22 three.
23     Q.  Do you recall when you submitted

Page 115

1 your final report to Bradley, Arant &
2 Boult?
3     A.  My memory is that it was on
4 June -- June the 16th, I believe.
5     Q.  Did you submit any reports after
6 June 16th to Bradley, Arant & Boult?
7     A.  No.  I said "June 16th."  I
8 should have said July 16th.
9     Q.  Okay.  Do you recall the dates
10 you submitted your preliminary drafts to
11 Bradley, Arant & Boult?
12     A.  My recollection is that the
13 first draft was sent on July the 12th.  I
14 e-mailed it, so you will be able to
15 ascertain the day and time that it was
16 sent.
17     Q.  And then you testified you had
18 submitted a second draft?
19     A.  Yes.
20     Q.  Do you recall the date?
21     A.  I don't.  But it would be
22 between July 12th and July 16th.
23         MS. RUCKER:  We can go off the

Page 116

1 record for just a minute.
2         (Whereupon, an off-the-record
3 discussion was held.)
4         (Whereupon, a lunch recess was
5 taken at 12:35 p.m., and the deposition
6 reconvened at 1:38 p.m.)
7         MS. RUCKER:  We can go back on
8 the record.
9     Q.  (BY MS. RUCKER)  Dr. Baker, if
10 you can turn your attention to Plaintiff's
11 Exhibit B, which is the expert disclosure
12 report.
13         In your report, you state that
14 you disagree with Dr. LaJeunesse's
15 assumption with regard to Mr. Bradberry's
16 potential damages.  I believe that's
17 contained on page -- it's summarized
18 initially on pages 1 and 2 of your report.
19         Can you explain your findings or
20 your conclusions with regard to that
21 assertion -- or your assertion?
22     A.  Yes.  In my opinion,
23 Dr. LaJeunesse substantially overstates

29  (Pages 113 to 116)

**American Court Reporting**
**August 23, 2010**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 181

1 married filing jointly. And as a matter of
2 fact, I believe I've produced such a
3 schedule.
4    Q. Is that one of your appendices?
5    A. No. I think it's listed in
6 Section 2 of my report. I will look for it
7 and identify it for you. Here it is on
8 page 7, third bullet from the bottom.
9    Q. With the footnote 10?
10    A. Yes.
11    Q. The "Internal Revenue Service
12 2009 Tax Rate Schedule Y-1, married filing
13 jointly"?
14    A. That's correct.
15    Q. Okay.
16    A. And now I understand that this
17 Web site that I referenced at footnote 10
18 has the 2010 schedule.
19    Q. Okay. Dr. Baker, I understand
20 that on page 13 and 14 of your report you
21 dispute Dr. LaJeunesse's rate of interest
22 that he applied to backpay award?
23    A. On page 13?

Page 182

1    Q. On page 14.
2    A. 14, yes.
3    Q. On page 14.
4    A. Yes.
5    Q. And I believe you state that he
6 used -- the amount of interest over the
7 backpay period are inappropriate. You
8 state that the figures he used were in
9 error and that he should have applied the
10 interest rate over a period of years as
11 opposed to a particular week. Is that a
12 fair characterization of your findings on
13 page 14 and 15?
14    A. I do object to the way in which
15 Dr. LaJeunesse computed interest on the
16 backpay. He picks a week and applies the
17 rate for that week for over many other
18 weeks. And that's an unusual -- in my
19 experience, that's a very unusual method of
20 determining the interest rate to use. In
21 any event, my understanding is that the
22 Court dictates the rates that are to be
23 applied and the compounding schedule. So I

Page 183

1 suppose some court could say, do it the way
2 Dr. LaJeunesse suggested, but I have never
3 seen that done. And had he used the
4 average yield over specific time periods,
5 that would be more consistent with what I,
6 in my experience, have known courts to
7 order. But, as I think I said in my
8 report, the computation of interest is
9 usually done after the Court has said, in
10 this jurisdiction, this is the way it is to
11 be computed and how it is to be compounded.
12    Q. I don't see that referenced in
13 your report.
14    A. Well, let's see. I can find it.
15 Look at page 12, footnote 22. I wrote, "I
16 have not computed the value of interest
17 that could have been earned from the
18 investment of these past losses. Such a
19 computation can be readily made once the
20 Court has articulated the rates and
21 compounding schedule to be used."
22    MS. RUCKER: If we can go off
23 the record for a minute.

Page 184

1    (Whereupon, an off-the-record
2 discussion was held.)
3    (Whereupon, a brief recess was
4 taken at 3:40 p.m., and the deposition
5 reconvened at 3:57 p.m.)
6    Q. (BY MS. RUCKER) Dr. Baker, with
7 regard to Section 4 of your report, your
8 critique of Dr. LaJeunesse's statistical
9 analysis of the age composition of center
10 store managers, with regard to the external
11 labor market, as I understand it, rather
12 than using an external labor market
13 analysis, you used actual applicant data
14 flow in your critique; is that correct?
15    A. I did present an analysis using
16 applicant data. But I also offer workforce
17 analyses using external labor market data.
18 And the result of those statistical
19 analyses are shown at Table 2 on page 22
20 and Appendix D.
21    Q. And Appendix D in Table 2 are
22 essentially your computation of District 36
23 total management workforce; is that not

46 (Pages 181 to 184)

**American Court Reporting**
**August 23, 2010**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 185

1   correct?
2      **A.** In those analyses, I do include
3   all store management employees.
4      **Q.** Okay.
5      **A.** With Table 2, as I explained in
6   my report, I did not include the inventory
7   control managers because, in District 36,
8   those store management employees do not
9   supervise associates. But in the event
10  that someone thinks that they should be
11  included, I provided Appendix D where
12  inventory control managers are counted in
13  this store management employee category.
14     **Q.** And your calculations found in
15  Table C -- or Appendix C, rather, am I
16  correct to assume that you used applicant
17  flow information in your tabulations found
18  in Appendix C?
19     **A.** I did.
20     **Q.** And what was the source of that
21  applicant flow information?
22     **A.** My understanding is that these
23  data were extracted primarily from the

Page 186

1   applicant -- I started to say applicant
2   tracking system. That may not be the right
3   term for it -- but from the electronic
4   system that Winn-Dixie employees use to
5   apply for positions.
6      **Q.** I'm going to show you what will
7   be marked as Plaintiff's Exhibit M.
8      **A.** Okay.
9         (Whereupon, a document was
10  marked as Plaintiff's Exhibit Number M and
11  is attached to the original transcript.)
12     **Q.** Dr. Baker, do you need a minute
13  to review Plaintiff's Exhibit M?
14     **A.** I have reviewed it.
15     **Q.** Okay. Is this the source of the
16  applicant flow information in which you
17  extracted information to complete Table --
18  or Appendix C?
19     **A.** I used the data shown on
20  Plaintiff's Exhibit M to prepare the
21  analysis of selections for center store
22  manager that is shown at Appendix C.
23     **Q.** What steps did you take to

Page 187

1   ensure its reliability?
2      **A.** I don't have any information to
3   compare much of this to. My understanding
4   is that most of the records shown in this
5   database are from the electronic system
6   that Winn-Dixie employees use to apply for
7   other Winn-Dixie jobs as well as
8   applications that were submitted by others.
9         I can confirm that the
10  individual selected -- or shown as selected
11  on Plaintiff's Exhibit M were selected
12  using other documents that were available
13  to me. I have another document that
14  allowed me to confirm the applicants for
15  the particular center-store-manager job
16  that Mr. Bradberry sought. Otherwise, I
17  assume that the information was correctly
18  extracted from that electronic file.
19     **Q.** And when you reference other
20  documents that you had access to with
21  regards to the position that Mr. Bradberry
22  applied for, are those documents a part of
23  your work file?

Page 188

1      **A.** Yes.
2      **Q.** Did you bring those today?
3      **A.** Yes, I did. And I believe
4   one of them was a document upon which
5   Dr. LaJeunesse relied.
6      **Q.** Do you know what that document
7   was?
8      **A.** Yes. My understanding is
9   it showed the people who applied for
10  the center store -- particularly
11  center-store-manager job for which
12  Mr. Bradberry applied.
13     **Q.** With regard to the applicants
14  contained in Plaintiff's Exhibit M, did you
15  review any of the -- any other documents --
16  strike that.
17        With regard to the applicants as
18  set forth in Plaintiff's Exhibit M, did you
19  review any of their applications for the
20  center-store management position?
21     **A.** I believe I testified earlier
22  that I had seen Mr. Godwin's application
23  form -- my memory is that it was an exhibit

47  (Pages 185 to 188)

**American Court Reporting**
**August 23, 2010**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 189

1  to his deposition. And at the moment, I
2  don't recall having seen the application
3  forms for others who applied for this job
4  during this time period.
5      **Q.** Did you inquire as to how
6  Winn-Dixie recruited for the
7  center-store-manager position in 2007?
8      **A.** I don't know that I inquired
9  about it. I learned something about it
10 from the documents that were provided to
11 me.
12     **Q.** And what is your recollection of
13 the recruitment process for the
14 center-store management position in 2007?
15     **A.** My recollection is that there
16 was an announcement made in early 2007 that
17 codirectors and center store managers would
18 be selected during some time frame and
19 that, following those selections, other
20 positions would be staffed. My
21 understanding is that Winn-Dixie employees
22 who are interested could apply for as many
23 as -- I believe it was three positions in

Page 190

1  each of the so-called waves of selections
2  with the first wave being codirector and
3  center-store-manager selections.
4      **Q.** Do you know whether or not
5  Winn-Dixie posted advertisements for the
6  center-store-manager position on its Web
7  site in 2007?
8      **A.** I don't know exactly what you
9  mean by its Web site. I understand that
10 that position was posted in the electronic
11 system that Winn-Dixie employees use to
12 apply for jobs.
13     **Q.** Do you know if the announcement
14 was made available to external candidates
15 for the 2007 center-store-manager position?
16     **A.** I don't know that any formal
17 public announcement was made. I don't know
18 that it wasn't either.
19     **Q.** To your knowledge, were you
20 given complete applicant data information?
21     **A.** To my knowledge, I have been
22 provided all of the applicant data that
23 Winn-Dixie has for the center-store-manager

Page 191

1  jobs in District 36.
2      **Q.** I'm going to ask you to turn
3  your attention to Appendix C of your
4  report. And, if you could, walk me
5  through your analysis for the positions in
6  District 36 -- or the center-store-manager
7  positions in 36. For example, starting
8  with Store 407, it appears that there was a
9  posting date January 26, 2007. And then to
10 the right I see, number of employees,
11 number of employees age 40 and over, and et
12 cetera. Can you tell me what each column
13 represents?
14     **A.** Yes. Number of employees --
15 actually I should have said number of
16 applications. Six is the number of
17 individuals who applied for the
18 center-store-manager, District 36 job at
19 Store 407 which was posted on 1/26/2007.
20 And if you look at Plaintiff's Exhibit M,
21 that's this posting, the very first one.
22     **Q.** Yes, ma'am.
23     **A.** Then the next column is the

Page 192

1  number of applications submitted by
2  individuals age 40 and older. There are
3  two. The next column labeled "Percent age
4  40 and older" is the number 40 -- number of
5  applications submitted by people 40 and
6  older divided by the total number of
7  applications. And for this particular
8  posting, that was 33.33 percent. The
9  number of selections from this posting is
10 one person. The next column indicates that
11 that one person was under age 40. The next
12 column gives the number of older selections
13 that would be expected giving older-worker
14 representation in the candidate pool for
15 this posting. And that is obtained by
16 multiplying the total number of selections
17 by the percent age 40 or older. One person
18 was selected. The candidate pool was
19 33.33 percent older, so we would predict
20 that one-third of a person -- older person
21 would have been selected. No -- the one
22 selected person was under 40, so we have a
23 shortfall of a third of a person. That's

48  (Pages 189 to 192)

**American Court Reporting**
**August 23, 2010**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 193

1  in the difference between actual and
2  predicted column.  Then I show the
3  hypergeometric number of standard
4  deviations of the difference, which is
5  negative 0.71.  The hypergeometric
6  continuity corrected number of standard
7  deviations is zero.  And the Fisher's
8  two-tailed probability of chance occurrence
9  is 100 percent.  Those are inferential
10  statistics that are used to determine the
11  likelihood that this result was the result
12  obtained -- would have been obtained in a
13  selection system that was neutral with
14  respect to age group.
15     Q.  Okay.
16     A.  So I go through that same
17  process for each posting for which at least
18  one person was selected.  And then I use a
19  procedure -- a statistical procedure to
20  aggregate across these postings.  In the
21  case of the hypergeometric analyses, both
22  the non-continuity corrected and continuity
23  corrected methods, I used the

Page 194

1  Mantel-Haenszel method, and I aggregated
2  the results of the Fisher's exact test
3  using the common odds ratio method.
4     Q.  Did you use a particular
5  computer program in calculating your
6  standard deviations?  Was there a
7  particular program you did, or were these
8  manual calculations?
9     A.  They were done, I believe, in
10  the software package called SAS, S-A-S.
11     Q.  Is that a program that is
12  available to anyone, or is that unique to
13  ERS or --
14     A.  It's a commercially-available
15  software package; very commonly used.  You
16  wouldn't have to use SAS.  There are many
17  other statistical packages that offer the
18  same procedures.
19     Q.  And Dr. Baker, with regard to
20  your calculations, am I understanding that
21  you used information from the flow log
22  identified as Plaintiff's Exhibit M in
23  preparing Table C?

Page 195

1     A.  The data used to prepare the
2  analysis shown at Appendix C is Plaintiff's
3  Exhibit M.
4     Q.  Is that the sole source of your
5  information?
6     A.  Except for the statistics that I
7  computed.
8     Q.  Okay.
9     A.  But the store number, the
10  posting date, the job entry date, the
11  number of applications, the number of
12  applications from individuals age 40 and
13  older, the number of selections, and the
14  number of selections age 40 and older all
15  came from the information provided on
16  Plaintiff's Exhibit M.
17     Q.  And I guess I should have
18  prefaced this throughout the day, please,
19  forgive me if I use a technical term that
20  is not correct, but in this instance, am I
21  correct in stating that, based upon your
22  findings, that you didn't find any
23  significant variations or -- with regard to

Page 196

1  the standard deviation?
2     A.  The results of the analysis
3  shown at Appendix C reveals that there is
4  no statistically significant difference
5  between the actual and the expected
6  outcome.
7     Q.  Dr. Baker, math is not my strong
8  point, but when I look at, for example,
9  column 3 or column -- if I am adding
10  correctly for where it says, "number of
11  employees age 40 or older" -- and I
12  understand that you meant to say, number of
13  applicants age 40 and over, that column to
14  me is not totaling 38, just upon my rough
15  estimate.  Let me count.  I'm coming up
16  with a number of 32.
17     A.  I will check that.
18     Q.  Yes, I'm not coming up with a
19  number of 38.
20     A.  And there may be an explanation
21  for that.  It will take me a while to
22  figure it out.
23     Q.  But at this juncture, you don't

49 (Pages 193 to 196)

**American Court Reporting**
**August 23, 2010**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 197

1   know why there is a shortfall?
2      A.  There may be that -- I would
3   have to compare Plaintiff's Exhibit M to
4   Appendix C.
5      Q.  Didn't you do that in your
6   analysis?
7      A.  I used the data there, yes.
8      Q.  Okay.  And then going back to
9   Appendix M and comparing --
10     A.  Wait a minute.  Wait a minute.
11  You are talking about the number 38 which
12  is the column labeled "number of employees"
13  which should be number of applicants age 40
14  and older?
15     Q.  Yes.
16     A.  Some people applied for more
17  than one job, I believe.  So the number of
18  selections is 42.  I can confirm that and
19  will do that.  But you could apply for more
20  than one center-store-manager job.
21     Q.  Yes.  But, Dr. Baker, wouldn't
22  that be reflected for each store?  For
23  example, if ten people applied for store

Page 198

1   527, regardless if those same individuals
2   applied --
3      A.  Yes.
4      Q.  -- at Store 523, wouldn't those
5   numbers still be reflective --
6      A.  They might.  I'll have to -- I
7   think that there is a reason why that's
8   different but, off the top of my head, I
9   don't know it.  And certainly if it's an
10  error, I'll correct it.
11     Q.  And wouldn't that number impact
12  your calculations as to the standard
13  deviation?  If, for example, there were
14  more individuals over 40 who applied at a
15  store and that number is not reflected,
16  isn't it conceivable that then your
17  projections or your figures regarding the
18  standard deviations would be off as well?
19     A.  Not if the numbers for each
20  posting in the column labeled "number of
21  employees age 40 and older" are correct.
22  That 38 number would not figure into the
23  computation of anything else on this page.

Page 199

1      Q.  Well, for example, Dr. Baker,
2   with regard to -- if you look at Store 451,
3   in Table C, it appears that there were six
4   applicants.  And you state that only one of
5   the applicants was over age 40.  However,
6   when I look at Plaintiff's Exhibit M for
7   Store 451, I calculate that there were more
8   than six applicants for that position.  I
9   calculate ten.
10     A.  I think you are mixing postings.
11     Q.  Okay.  So, for example, where it
12  states on page Bates label 1131 --
13     A.  1131?
14     Q.  Yes.
15     A.  1131 is not in Plaintiff's
16  Exhibit M.
17     Q.  Bates label 1131?
18     A.  It starts with 1132.
19     Q.  But if I am looking at Store
20  451, I believe your testimony was, for the
21  January posting, there were only six
22  applicants?
23     MS. MCGAHEY:  I'm sorry.  I'm

Page 200

1   confused.  What documents are we comparing
2   or are we analyzing right now?
3      MS. RUCKER:  We are looking
4   at --
5      MS. MCGAHEY:  Plaintiff's
6   Exhibit M.
7      MS. RUCKER:  -- Plaintiff's
8   Exhibit M, Bates label --
9      A.  This posting --
10     Q.  Right.
11     A.  -- has six applications.
12     Q.  Okay.
13     A.  What you are running together
14  with that are two other postings at 451.
15  If you look at this information here --
16     Q.  Yes.
17     A.  -- in the column "job opening
18  ID," you will see that it is different.
19     Q.  Are there two listings for
20  Store 451 on your Table C?
21     A.  No.  And I wouldn't expect to
22  find them because, if you look at these two
23  postings, no one was selected.

50 (Pages 197 to 200)

**American Court Reporting**
**August 23, 2010**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 201

1    Q.  Okay.
2    A.  And if no one was selected,
3  there is nothing to analyze so it wouldn't
4  show up on the table.
5    Q.  So your table only reflects
6  positions that were higher?
7    A.  That's the only situation that
8  can be analyzed.  If there were no
9  selections, then the expected number of
10  older selections is zero.  The actual
11  number of older selections is zero.  The
12  difference is zero.  And the number of
13  standard deviations is zero.  You have to
14  have someone selected in order to have an
15  expected outcome other than zero.
16    Q.  So with respect to Store 543
17  where it states that there were two
18  applicants for a January 26th posting, and
19  neither of those applicants were selected,
20  that didn't make your Table C as well?
21    A.  That's right.
22    Q.  Okay.
23    A.  Well, let me look at that again.

Page 202

1  Show me where you are --
2    Q.  If you will look at Bates label
3  1137.
4    A.  Okay.
5    Q.  And where it states that, for
6  Store 543, there were two applicants for
7  the store -- for the January 26, 2007,
8  posting, and it states, not selected.
9    A.  For both of them.
10    Q.  Right.
11    A.  There is nothing to analyze
12  unless someone was selected.
13    Q.  With respect to the Store 520
14  selection, you state that there was only
15  one candidate that applied, Ms. Pettaway.
16    A.  That's what the data show.
17    Q.  Did you know if Ms. Pettaway
18  applied for more than one position?
19    A.  She did.
20    Q.  And are all of her applications
21  reflected on Table C?
22        MS. MCGAHEY:  Objection to the
23  form.

Page 203

1    A.  It's Appendix C.  She would be a
2  part of the applicant pool if or for all of
3  the positions for which she applied and
4  someone was selected.
5    Q.  And does -- you may have
6  testified to this already, and I apologize
7  if you did -- are external applicants also
8  included in Table C?
9    A.  Yes, they are.
10    Q.  Okay.  Dr. Baker, it appears
11  that for approximately ten of these
12  positions there was only one applicant and
13  that, for 17 other positions, there were
14  only two applicants.  Do you believe that
15  you had a sufficient number of applicants
16  to -- strike that.
17        Do you believe that the fact
18  that there was only one or two applicants
19  for most of these positions, i.e., ten
20  applicants for -- there were only ten
21  openings that had one applicant and that
22  there were 17 openings that only had two
23  applicants -- was there a sufficient number

Page 204

1  of applicants to establish a sufficient
2  labor market benchmark for your analysis?
3    A.  This analysis doesn't use a
4  labor market benchmark.
5    Q.  Well, I will strike that.  Is
6  that because you used real applicants;
7  correct?
8    A.  It's based on the applicant
9  data.
10    Q.  Okay.  Dr. Baker, with regard to
11  Table D --
12    A.  Appendix D?
13    Q.  Yes -- Appendix D -- you state
14  that for all stores in District 36 that the
15  external labor market -- that the applicant
16  pool is 51.2 percent; is that correct -- as
17  to individuals available in the labor
18  market over 40 year of age; is that
19  correct?
20    A.  Part of what you said is
21  correct, but you threw applicant flow in
22  there.
23    Q.  Okay.  I will strike that.  It's

**American Court Reporting**
**August 23, 2010**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 205

1  getting long in the day.  Let me restart.
2      **A.**  I agree.
3      **Q.**  Okay.  With regard to your
4  external labor market as reflected in
5  Appendix D, you state that the age
6  40-and-over population is 51 percent -- or
7  51.2 percent.  Is that a fair
8  characterization of your statement in
9  Table D?
10     **A.**  What I have stated with regard
11 to Table D is that the percent -- according
12 to the 2000 census, the percent age 40 and
13 older among individuals who work in the
14 occupation first-line supervisor, slash,
15 managers of retail sales workers in
16 Montgomery and Tuscaloosa Counties was
17 51.2 percent.
18     **Q.**  Okay.  And that's for all stores
19 within the district; correct?
20     **A.**  The 51.2 percent --
21     **Q.**  Yes, ma'am.
22     **A.**  -- is all individuals who at the
23 time this 2000 census was taken worked in

Page 206

1  Census Occupation Code 470, and they worked
2  in either Montgomery or Tuscaloosa County,
3  Alabama.  So District 36 has stores in
4  counties other than Montgomery and
5  Tuscaloosa County.
6      **Q.**  And do you know the census data
7  for those counties with respect to
8  individuals age 40 and over?
9      **A.**  It's not available.
10     **Q.**  So conceivably age 40-and-over
11 persons may -- in those counties where
12 census information was available, it's
13 conceivable that persons age 40 and over
14 could comprise more than 51 percent of the
15 available applicants?
16     **A.**  Or less.  At page 19 of my
17 report, I list the counties other than
18 Montgomery and Tuscaloosa in which
19 Winn-Dixie operates stores that are part of
20 District 36.  And in footnote 38, I give
21 the store numbers that are associated with
22 each county.
23     **Q.**  And this includes the county

Page 207

1  where Mr. Bradberry is employed -- or it
2  includes one of the counties where
3  Store 543 is located; is that correct?
4      **A.**  I think I understand the
5  question.
6      **Q.**  I can rephrase it.
7      **A.**  Store 543 is located in Selma,
8  Alabama, which is in Dallas County,
9  Alabama, so it is not in Montgomery County
10 or Tuscaloosa County, Alabama.
11     **Q.**  Do you know what the age 40 in
12 population -- age 40-and-over population is
13 in Dallas County during the period of 2007?
14     **A.**  Of the population?
15     **Q.**  The age 40-and-over population
16 in Dallas County in 2007.
17     **A.**  And what would I know about it?
18     **Q.**  Do you know what percentage of
19 the population was age 40 and over?
20     **A.**  In Dallas County?
21     **Q.**  Yes, ma'am.
22     **A.**  No.  And that would be
23 irrelevant to this case in any event.  You

Page 208

1  would need to know the percent of workers
2  age 40 and older in Dallas County who
3  worked in the Census Occupation Code 470
4  first-line supervisor, slash, managers of
5  retail salespersons.
6      **Q.**  And was it your previous
7  testimony that such information was not
8  available?
9      **A.**  The census did not report it for
10 Dallas County.
11     **Q.**  Was that information available
12 from any other source other than the
13 census?
14     **A.**  Not to my knowledge by
15 occupation and age group.
16     **Q.**  Dr. Baker, do you know why -- or
17 do you have a hypothesis as to why if
18 there -- if the labor market is, say,
19 51 percent age 40 and over for available
20 frontline managers, why when you look at
21 the actual applicant flow data for the
22 center-store-manager position in 2007 your
23 figures only reflect 33 percent of the

52  (Pages 205 to 208)

**American Court Reporting**
**August 23, 2010**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 209

1 actual applicants were above age 40 and
2 over?  Do you know why there is a
3 20 percent difference or why there would be
4 a 20 percent difference?
5     **A.**  Well, I can speculate about
6 that.  But you said something about
7 frontline managers, and I didn't quite
8 understand that.
9     **Q.**  I will strike frontline
10 managers.  And I can rephrase the question.
11         As I understand it or as
12 reflected in Appendix D, you opine that the
13 age composition, age 40 and over, of
14 Winn-Dixie store management personnel,
15 including inventory control managers, you
16 estimate the percent age 40 and over and
17 proxy to the external labor market is
18 51 percent -- 51.2 percent to be exact.  Is
19 that accurate?
20     **A.**  That is the percent age 40 and
21 older among individuals who work in Census
22 Occupation Code 470 first-line supervisors/
23 managers of retail salespersons in

Page 210

1 Montgomery and Tuscaloosa Counties.
2     **Q.**  And I will refer to that as
3 Census Code 470 workers.
4     **A.**  That's good.
5     **Q.**  Okay.  Now, with respect to
6 actual applicants for the
7 center-store-manager position, it appears
8 based upon your findings as reflected in
9 Table C that the actual applicant pool
10 reflects that 33 percent of workers who
11 applied were age 40 and over; is that
12 correct?
13     **A.**  Appendix C shows that the
14 weighted average percent age 40 and over in
15 the applicant pool shown on this table were
16 age 40 or older.
17     **Q.**  Do you have a theory or a
18 hypothesis as to if there is an applicant
19 pool of over 50 percent of census code
20 workers for 470 available for the
21 center-store-manager position why the
22 applicant pool only contained 30 percent or
23 33 percent in a protected group?

Page 211

1     MS. MCGAHEY:  Objection to the
2 form.
3     **A.**  Well, there are many reasons.
4 But somehow you threw applicant pool in
5 there.
6     **Q.**  I will strike applicant pool.
7     **A.**  So I think what you are asking
8 me is why would I -- why would I find
9 33.36 percent as the average representation
10 rate of older individuals in the actual
11 applicant pools when the census data for
12 Code 470 shows that people in that
13 occupation -- or among people in that
14 occupation, 51.2 percent of them were at
15 least age 40; is that --
16     **Q.**  Thank you, Dr. Baker, that's a
17 correct characterization of my question.
18 Thank you.
19     **A.**  All right.  Well, there are
20 plenty of reasons why that may be the case.
21 This is a relatively small number of people
22 who are seeking a job that fits within this
23 much broader Census Occupation Code.  As I

Page 212

1 said in my report, Census Occupation Code
2 470 includes all levels of grocery store
3 management employees as well as managers of
4 other retail sales workers in other kinds
5 of industries.  And so consequently you
6 should not compare the age composition of
7 one of many jobs that fits within Census
8 Occupation Code 470.  Reasonable
9 comparisons to the external labor market
10 availability rate of 51.2 percent would
11 require that you look at all of the
12 Winn-Dixie store management employees in
13 District 36.  And, again, that's assuming
14 that the age composition of workers in that
15 occupation doesn't vary from one county to
16 another.
17     **Q.**  Okay.  So is it your testimony
18 there is no correlation between the
19 availability of workers as set forth in
20 Occupational Code 470 to the actual
21 applicants who applied for the
22 center-store-manager position in 2007?
23     **A.**  I can't think of any reason

53  (Pages 209 to 212)

**American Court Reporting**
**August 23, 2010**

## American Court Reporting
### toll-free (877) 320-1050

Page 213

1  whatsoever to expect a strong correlation
2  there.
3  MS. RUCKER:  We can go off the
4  record for one minute.
5  (Whereupon, an off-the-record
6  discussion was held.)
7  MS. RUCKER:  We can go back on
8  the record.
9  Q.  Dr. Baker, in preparation for
10  your testimony today, can you give an
11  estimate as to how much time you spent
12  preparing to be deposed today?
13  A.  Including the compilation of the
14  documents that I've produced?
15  Q.  Including your total effort in
16  preparing for today's deposition.
17  A.  My time?
18  Q.  Yes.
19  A.  Okay.  I'd say somewhere in the
20  range of -- I'm sure it was at least 8
21  hours and maybe as much as 12 hours --
22  Q.  And prior --
23  A.  -- not counting the time that I

Page 214

1  have been here.
2  Q.  I understand.
3  A.  Yes.
4  Q.  And did your preparation include
5  spending any time with either Ms. McGahey
6  or Mr. Smith T?
7  A.  Yes.
8  Q.  And how long did you meet with
9  Ms. McGahey in preparation for today's
10  deposition?
11  A.  I met with Ms. McGahey and for
12  part of the time with Mr. Smith T for less
13  than two hours yesterday.
14  MS. RUCKER:  That ends my
15  questioning for today.  Thank you.  Thank
16  you very much.
17  THE WITNESS:  Thank you.
18  (Whereupon, the deposition ended
19  at 4:50 p.m.)
20
21
22
23

Page 215

1  CERTIFICATE
2
3  STATE OF ALABAMA)
4  JEFFERSON COUNTY)
5
6  I hereby certify that the above and
7  foregoing deposition was taken down by me
8  in stenotype, and the questions and answers
9  thereto were transcribed by means of
10  computer-aided transcription, and that the
11  foregoing represents a true and correct
12  transcript of the deposition given by said
13  witness upon said hearing.
14  I further certify that I am neither
15  of counsel nor of kin to the parties to the
16  action, nor am I in anywise interested in
17  the result of said cause.
18
19
20
                Diana B. Williams, CCR, CLR
21              Certificate No:  AL-CCR-104
22
     My Commission expires
23   April 11, 2011

54  (Pages 213 to 215)

## American Court Reporting
### August 23, 2010

WINN-DIXIE
FLOW LOG

| FULL NAME | JP DISTRICT | JP_LOC | JOB OPENING_ID | STORE/DATE/JOB OPENING ID | DATE OF BIRTH | DISPOSITION | JOB ENTRY DATE |
|---|---|---|---|---|---|---|---|
| MARTIN,DEWARREN M | 36 | 407 | JAX00036040701005220070126001 | 407 - 01/26/07 (JAX00036040701005220070126001) | 03/25/86 | Not Selected | |
| COX,ALICIA N | 36 | 407 | JAX00036040701005220070126001 | 407 - 01/26/07 (JAX00036040701005220070126001) | 12/17/82 | Not Selected | |
| PRINCE,EDDIE R | 36 | 407 | JAX00036040701005220070126001 | 407 - 01/26/07 (JAX00036040701005220070126001) | 03/29/77 | Not Selected | |
| GREEN,EDRIC A | 36 | 407 | JAX00036040701005220070126001 | 407 - 01/26/07 (JAX00036040701005220070126001) | 10/08/61 | Not Selected | |
| CLIFTON SR,CHARLES R | 36 | 407 | JAX00036040701005220070126001 | 407 - 01/26/07 (JAX00036040701005220070126001) | 12/08/55 | Not Selected | |
| BUSH III,ROBERT | 36 | 407 | JAX00036040701005220070126001 | 407 - 01/26/07 (JAX00036040701005220070126001) | 08/06/75 | Selected | 3/8/2007 |
| | | | | | | | |
| RITTENBURGH,ELI K | 36 | 407 | JAX00036040701005220080626001 | 407 - 06/28/08 (JAX00036040701005220080626001) | 04/24/85 | Not Selected | |
| THOMPSON JR,EARL J | 36 | 407 | | | 11/20/1976 | Selected | 8/23/2008 |
| | | | | | | | |
| LUCAS,BENJAMIN J | 36 | 411 | JAX00036041101005220070126001 | 411 - 01/26/07 (JAX00036041101005220070126001) | 08/04/86 | Not Selected | |
| BEASLEY,DOUGLAS E | 36 | 411 | JAX00036041101005220070126001 | 411 - 01/26/07 (JAX00036041101005220070126001) | 09/03/82 | Not Selected | |
| FRANKLIN,ANNA M | 36 | 411 | JAX00036041101005220070126001 | 411 - 01/26/07 (JAX00036041101005220070126001) | 09/15/68 | Not Selected | |
| LECUYER,JESSICA L | 36 | 411 | JAX00036041101005220070126001 | 411 - 01/26/07 (JAX00036041101005220070126001) | 11/09/80 | Selected | 1/28/2007 |
| | | | | | | | |
| SPENCER,JEREMY G | 36 | 428 | JAX00036042801005220070126001 | 428 - 01/26/07 (JAX00036042801005220070126001) | 07/30/87 | Not Selected | |
| TOWNE,BART S | 36 | 428 | JAX00036042801005220070126001 | 428 - 01/26/07 (JAX00036042801005220070126001) | 06/09/84 | Not Selected | |
| FRENCH,NATHAN J | 36 | 428 | JAX00036042801005220070126001 | 428 - 01/26/07 (JAX00036042801005220070126001) | 08/15/78 | Not Selected | |
| HOWARD,BRYAN A | 36 | 428 | JAX00036042801005220070126001 | 428 - 01/26/07 (JAX00036042801005220070126001) | 09/02/84 | Selected | 1/28/2007 |
| | | | | | | | |
| DENHAM,CATHLINE E | 36 | 428 | JAX00036042801005220080515001 | 428 - 05/15/08 (JAX00036042801005220080515001) | 04/05/85 | Not Selected | |
| WICKHAM,KIM L | 36 | 428 | | | 12/31/1956 | Selected | 7/3/2008 |
| | | | | | | | |
| SNYDER,JOHN T | 36 | 446 | JAX00036044601005220070126001 | 446 - 01/26/07 (JAX00036044601005220070126001) | 12/20/72 | Not Selected | |
| | | | | | | | |
| MANORA,ERIC M | 36 | 446 | JAX00036044601005220071002001 | 446 - 10/02/07 (JAX00036044601005220071002001) | 09/28/83 | Selected | 10/4/2007 |
| | | | | | | | |
| LEE,CHAPMAN L | 36 | 446 | JAX00036044601005220080419001 | 446 - 04/19/08 (JAX00036044601005220080419001) | 03/11/76 | Not Selected | |
| WILLIAMS,DONALD R | 36 | 446 | | | 06/20/78 | Selected | 6/5/2008 |

D01132

PLAINTIFF'S
EXHIBIT

Baker
8-10-10

M

Privileged & Confidential

CONFIDENTIAL

WINN-DIXIE
FLOW LOG

| FULL NAME | JP_DISTRICT | JP_LOC | JOB_OPENING_ID | STORE/DATE/JOB OPENING ID | DATE OF BIRTH | DISPOSITION | JOB ENTRY DATE |
|---|---|---|---|---|---|---|---|
| SPENCER,JEREMY G | 36 | 448 | JAX000360448010052200701260001 | 448 - 01/26/07 (JAX000360448010052200701260001) | 07/30/87 | Not Selected | |
| WILLIAMS,DONALD R | 36 | 448 | JAX000360448010052200701260001 | 448 - 01/26/07 (JAX000360448010052200701260001) | 06/20/78 | Not Selected | |
| WELDON,CARLTON R | 36 | 448 | JAX000360448010052200701260001 | 448 - 01/26/07 (JAX000360448010052200701260001) | 05/07/75 | Not Selected | |
| PETTAWAY,DEMETRIA D | 36 | 448 | JAX000360448010052200701260001 | 448 - 01/26/07 (JAX000360448010052200701260001) | 01/01/75 | Not Selected | |
| WELDON,CARLTON R | 36 | 448 | JAX000360448010052200703080001 | 448 - 03/08/07 (JAX000360448010052200703080001) | 05/07/75 | Not Selected | |
| FOSSEE,LOUIS JOHN | 36 | 448 | JAX000360448010052200703080001 | 448 - 03/08/07 (JAX000360448010052200703080001) | 7/14/1954 | Selected | 3/15/2007 |
| WELDON,CARLTON R | 36 | 448 | JAX000360448010052200704250001 | 448 - 04/25/07 (JAX000360448010052200704250001) | 05/07/75 | Not Selected | |
| DEAN,MICHAEL E | 36 | 448 | JAX000360448010052200704250001 | 448 - 04/25/07 (JAX000360448010052200704250001) | 09/27/78 | Selected | 4/27/2007 |
| WELDON,CARLTON R | 36 | 448 | JAX300360448010052200709280001 | 448 - 09/28/07 (JAX300360448010052200709280001) | 05/07/75 | Not Selected | |
| GILMORE,LARRY ALLEN | 36 | 448 | JAX300360448010052200709280001 | 448 - 09/28/07 (JAX300360448010052200709280001) | 6/6/1980 | Selected | 10/11/2007 |
| FULLER,HENRY A | 36 | 448 | | | 11/8/1978 | Selected | 12/23/2009 |
| WESSON,ZACHERY D | 36 | 451 | JAX000360451010052200701260001 | 451 - 01/26/07 (JAX000360451010052200701260001) | 1/10/84 | Not Selected | |
| HEADLEY JR,MICHAEL R | 36 | 451 | JAX000360451010052200701260001 | 451 - 01/26/07 (JAX000360451010052200701260001) | 01/29/79 | Not Selected | |
| FRENCH,NATHAN J | 36 | 451 | JAX000360451010052200701260001 | 451 - 01/26/07 (JAX000360451010052200701260001) | 08/15/78 | Not Selected | |
| ADAMS,EDWARD A | 36 | 451 | JAX000360451010052200701260001 | 451 - 01/26/07 (JAX000360451010052200701260001) | 11/20/75 | Not Selected | |
| CANDLER JR,JACK M | 36 | 451 | JAX000360451010052200701260001 | 451 - 01/26/07 (JAX000360451010052200701260001) | 08/12/57 | Not Selected | |
| TOWNE,BART S | 36 | 451 | JAX000360451010052200701260001 | 451 - 01/26/07 (JAX000360451010052200701260001) | 06/09/84 | Selected | 1/28/2007 |
| ANDERSON,WILLIAM B | 36 | 451 | JAX000360451010052200707310001 | 451 - 07/31/07 (JAX000360451010052200707310001) | 03/25/62 | Not Selected | |
| BONE,RANDALL | 36 | 451 | JAX000360451010052200707310001 | 451 - 07/31/07 (JAX000360451010052200707310001) | 04/04/52 | Not Selected | |
| TOWNE,BART S | 36 | 451 | JAX300360451010052200709160001 | 451 - 09/16/07 (JAX300360451010052200709160001) | 06/09/84 | Not Selected | |
| BONE,RANDALL | 36 | 451 | JAX300360451010052200709160001 | 451 - 09/16/07 (JAX300360451010052200709160001) | 04/04/52 | Not Selected | |

CONFIDENTIAL

Privileged & Confidential

D01133

WINN-DIXIE
FLOW LOG

| FULL NAME | JP DISTRICT | JP_LOC | JOB_OPENING_ID | STORE/DATE/JOB OPENING ID | DATE OF BIRTH | DISPOSITION | JOB ENTRY DATE |
|---|---|---|---|---|---|---|---|
| PRINCE,EDDIE R | 36 | 453 | JAX000360453010052200701260001 | 453 - 01/26/07 (JAX000360453010052200701260001) | 03/29/77 | Not Selected | |
| GREEN,CEDRIC A | 36 | 453 | JAX000360453010052200701260001 | 453 - 01/26/07 (JAX000360453010052200701260001) | 10/08/61 | Not Selected | |
| EDWARDS,DANTAL | 36 | 453 | JAX000360453010052200701260001 | 453 - 01/26/07 (JAX000360453010052200701260001) | 10/26/77 | Selected | 1/28/2007 |
| | | | | | | | |
| WELDON,CARLTON R | 36 | 460 | JAX000360460010052200701260001 | 460 - 01/26/07 (JAX000360460010052200701260001) | 05/07/75 | Not Selected | |
| DENNEY,JOSHUA D | 36 | 460 | JAX000360460010052200701260001 | 460 - 01/26/07 (JAX000360460010052200701260001) | 02/28/75 | Not Selected | |
| STALLWORTH,BRITT O | 36 | 460 | JAX000360460010052200701260001 | 460 - 01/26/07 (JAX000360460010052200701260001) | 08/23/73 | Not Selected | |
| BONE,RANDALL | 36 | 460 | JAX000360460010052200701260001 | 460 - 01/26/07 (JAX000360460010052200701260001) | 04/04/52 | Not Selected | |
| PARKER,PATRICK | 36 | 460 | JAX000360460010052200701260001 | 460 - 01/26/07 (JAX000360460010052200701260001) | 01/24/78 | Selected | 3/8/2007 |
| | | | | | | | |
| HALL,MICHAEL E | 36 | 460 | | | 3/21/1959 | Selected | 7/11/2009 |
| | | | | | | | |
| WILLIAMS,ROBERT A | 36 | 463 | JAX000360463010052200701260001 | 463 - 01/26/07 (JAX000360463010052200701260001) | 09/21/83 | Not Selected | |
| DOLLAR,ADAM L | 36 | 463 | JAX000360463010052200701260001 | 463 - 01/26/07 (JAX000360463010052200701260001) | 03/08/82 | Not Selected | |
| COPELAND,ZULEYHA | 36 | 463 | JAX000360463010052200701260001 | 463 - 01/26/07 (JAX000360463010052200701260001) | 02/02/77 | Selected | 1/28/2007 |
| | | | | | | | |
| WILLIAMS,ROBERT A | 36 | 464 | JAX000360464010052200701260001 | 464 - 01/26/07 (JAX000360464010052200701260001) | 09/21/83 | Not Selected | |
| EDWARDS,JASON R | 36 | 464 | JAX000360464010052200701260001 | 464 - 01/26/07 (JAX000360464010052200701260001) | 01/24/78 | Not Selected | |
| PETTAWAY,DEMETRIA D | 36 | 464 | JAX000360464010052200701260001 | 464 - 01/26/07 (JAX000360464010052200701260001) | 01/01/75 | Not Selected | |
| CURTIS,CALDWELL | 36 | 464 | | | 07/17/81 | Selected | 3/22/2007 |
| | | | | | | | |
| FOWLER,RICHARD J | 36 | 471 | JAX000360471010052200701260001 | 471 - 01/26/07 (JAX000360471010052200701260001) | 12/15/74 | Selected | 1/28/2007 |

Privileged & Confidential

CONFIDENTIAL

D01134

WINN-DIXIE
FLOW LOG

| FULL NAME | JP DISTRICT | JP_LOC | JOB_OPENING_ID | STORE/DATE/JOB OPENING ID | DATE OF BIRTH | DISPOSITION | JOB ENTRY DATE |
|---|---|---|---|---|---|---|---|
| BASS,TED L | 36 | 476 | JAX000360476010052200701260001 | 476 - 01/26/07 (JAX000360476010052200701260001) | 12/16/56 | Not Selected | |
| SANS SOUCI,ELLYN F | 36 | 476 | JAX000360476010052200701260001 | 476 - 01/26/07 (JAX000360476010052200701260001) | 10/22/62 | Not Selected | |
| WOOD,JASON L | 36 | 476 | JAX000360476010052200701260001 | 476 - 01/26/07 (JAX000360476010052200701260001) | 01/31/83 | Selected | 1/28/2007 |
| | | | | | | | |
| CAMPBELL,ADAM J | 36 | 476 | JAX300360476010052200802060001 | 476 - 02/06/08 (JAX300360476010052200802060001) | 10/07/86 | Not Selected | |
| PHILLIPS,REBECCA CLARK | 36 | 476 | | | 10/10/64 | Selected | 3/6/2008 |
| | | | | | | | |
| DAVIS,JERRELL L | 36 | 479 | JAX000360479010052200701260001 | 479 - 01/26/07 (JAX000360479010052200701260001) | 11/17/86 | Not Selected | |
| MARTIN,DEWARREN M | 36 | 479 | JAX000360479010052200701260001 | 479 - 01/26/07 (JAX000360479010052200701260001) | 03/25/86 | Not Selected | |
| TINNON,KEVIN | 36 | 479 | JAX000360479010052200701260001 | 479 - 01/26/07 (JAX000360479010052200701260001) | 02/05/67 | Not Selected | |
| GREEN,CEDRIC A | 36 | 479 | JAX000360479010052200701260001 | 479 - 01/26/07 (JAX000360479010052200701260001) | 10/08/61 | Not Selected | |
| CLIFTON,CHARLES | 36 | 479 | JAX000360479010052200701260001 | 479 - 01/28/07 (JAX000360479010052200701260001) | 12/08/65 | Selected | 3/8/2007 |
| | | | | | | | |
| GREEN,CEDRIC A | 36 | 479 | JAX000360479010052200708230001 | 479 - 08/23/07 (JAX000360479010052200708230001) | 10/08/61 | Not Selected | |
| WALLER,MATTHEW W | 36 | 479 | JAX000360479010052200708230001 | 479 - 08/23/07 (JAX000360479010052200708230001) | 05/29/60 | Not Selected | |
| VINCENT,CLIFF | 36 | 479 | | | 12/17/1981 | Selected | 9/16/2007 |
| | | | | | | | |
| BRYANT,PATRICIA C | 36 | 479 | | | 11/9/1960 | Selected | 6/14/2008 |
| | | | | | | | |
| EDWARDS,JASON R | 36 | 503 | JAX000360503010052200701260001 | 503 - 01/26/07 (JAX000360503010052200701260001) | 01/24/78 | Not Selected | |
| DENNEY,JOSHUA D | 36 | 503 | JAX000360503010052200701260001 | 503 - 01/26/07 (JAX000360503010052200701260001) | 02/28/75 | Not Selected | |
| WILLIAMS,ROBERT A | 36 | 503 | | | 08/21/83 | Selected | 3/8/2007 |
| | | | | | | | |
| EDWARDS,JASON R | 36 | 503 | JAX000360503010052200806260001 | 503 - 06/26/08 (JAX000360503010052200806260001) | 01/24/78 | Selected | 6/28/2008 |
| | | | | | | | |
| PETTAWAY,DEMETRIA D | 36 | 520 | | | 01/01/75 | Selected | 3/8/2007 |
| | | | | | | | |
| EDWARDS,JASON R | 36 | 521 | JAX000360521010052200701260001 | 521 - 01/26/07 (JAX000360521010052200701260001) | 01/24/78 | Not Selected | |
| BAMBERG,ANTHONY T | 36 | 521 | JAX000360521010052200701260001 | 521 - 01/26/07 (JAX000360521010052200701260001) | 02/05/64 | Not Selected | |

Privileged & Confidential

D01135

CONFIDENTIAL

WINN-DIXIE
FLOW LOG

| FULL NAME | JP DISTRICT | JP_LOC | JOB OPENING ID | STORE/DATE/JOB OPENING ID | DATE OF BIRTH | DISPOSITION | JOB ENTRY DATE |
|---|---|---|---|---|---|---|---|
| BROOKS,EDWIN E | 36 | 521 | JAX0003605210100522007012600 01 | 521 - 01/26/07 (JAX0003605210100522007012600 01) | 12/07/62 | Not Selected | |
| SOWERS,DAVID | | 521 | | | 09/07/76 | Selected | 3/8/2007 |
| MORRISON RANDY | 36 | 521 | JAX0003605210100522007083000 01 | 521 - 08/30/07 (JAX0003605210100522007083000 01) | 03/19/60 | Not Selected | |
| GREGORY,CINDY L | 36 | 521 | | | 12/5/1955 | Selected | 9/8/2007 |
| MORRISON,RANDY | 36 | 521 | JAX0003605210100522007090417000 1 | 521 - 04/17/09 (JAX0003605210100522007090417000 1) | 03/19/60 | Not Selected | |
| ALLMAN,RANDY L | 36 | 521 | JAX0003605210100522007090929000 1 | 521 - 09/29/09 (JAX0003605210100522007090929000 1) | 12/13/56 | Not Selected | |
| MOORER,TAURUS HARRISON | 36 | 521 | | | 8/28/1977 | Selected | 7/11/2009 |
| GREEN,CEDRIC A | 36 | 526 | JAX0003605260100522007012600 01 | 526 - 01/26/07 (JAX0003605260100522007012600 01) | 10/08/61 | Not Selected | |
| MADISON,JO | 36 | 526 | | | 09/26/57 | Selected | 3/8/2007 |
| SPENCER,JEREMY G | 36 | 527 | JAX0003605270100522007012600 01 | 527 - 01/26/07 (JAX0003605270100522007012600 01) | 07/30/87 | Not Selected | |
| TOWNE,BART S | 36 | 527 | JAX0003605270100522007012600 01 | 527 - 01/26/07 (JAX0003605270100522007012600 01) | 06/09/84 | Not Selected | |
| BONE,MICHEAL R | 36 | 527 | JAX0003605270100522007012600 01 | 527 - 01/26/07 (JAX0003605270100522007012600 01) | 09/03/80 | Not Selected | |
| JACKSON,ALVIN R | 36 | 527 | JAX0003605270100522007012600 01 | 527 - 01/26/07 (JAX0003605270100522007012600 01) | 11/26/78 | Not Selected | |
| STUART,MARK T | 36 | 527 | JAX0003605270100522007012600 01 | 527 - 01/26/07 (JAX0003605270100522007012600 01) | 10/08/76 | Not Selected | |
| DENNEY,JOSHUA D | 36 | 527 | JAX0003605270100522007012600 01 | 527 - 01/26/07 (JAX0003605270100522007012600 01) | 02/28/75 | Not Selected | |
| JOHNSON,MARVINA D | 36 | 527 | JAX0003605270100522007012600 01 | 527 - 01/26/07 (JAX0003605270100522007012600 01) | 10/06/73 | Not Selected | |
| CANDLER JR,JACK M | 36 | 527 | JAX0003605270100522007012600 01 | 527 - 01/26/07 (JAX0003605270100522007012600 01) | 08/12/57 | Not Selected | |
| FRENCH,NATHAN J | 36 | 527 | JAX0003605270100522007012600 01 | 527 - 01/26/07 (JAX0003605270100522007012600 01) | 08/15/78 | Selected | 1/28/2007 |
| BONE,RANDALL | 36 | 527 | JAX0003605270100522007052500 01 | 527 - 05/25/07 (JAX0003605270100522007052500 01) | 04/04/52 | Not Selected | |
| ALEXANDER,KEVIN T | 36 | 527 | JAX0003605270100522007052500 01 | 527 - 05/25/07 (JAX0003605270100522007052500 01) | 02/18/77 | Selected | 5/27/2007 |
| ALEXANDER,KEVIN T | 36 | 527 | JAX3003605270100522007092500 01 | 527 - 09/25/07 (JAX3003605270100522007092500 01) | 02/18/77 | Not Selected | |

Privileged & Confidential

CONFIDENTIAL

D01136

WINN-DIXIE
FLOW LOG

| FULL NAME | JP DISTRICT | JP_LOC | JOB_OPENING_ID | STORE/DATE/JOB OPENING ID | DATE OF BIRTH | DISPOSITION | JOB ENTRY DATE |
|---|---|---|---|---|---|---|---|
| TOWNE,BART S | 36 | 527 | JAX3003605270105522007092S0001 | 527 - 09/25/07 (JAX3003605270105522007092S0001) | 06/08/84 | Selected | 9/27/2007 |
| COBURN,CHRISTOPHER WAYNE | 36 | 527 | | | 5/30/1979 | Selected | 10/11/2007 |
| | | | | | | | |
| TARWATER,RANDOL S | 36 | 528 | JAX0003605280105522007012600001 | 528 - 01/26/07 (JAX0003605280105522007012600001) | 10/26/72 | Not Selected | |
| GREEN,CEDRIC A | 36 | 528 | JAX0003605280105522007012600001 | 528 - 01/26/07 (JAX0003605280105522007012600001) | 10/08/61 | Not Selected | |
| FRANKS,JOHNNIE K | 36 | 528 | JAX0003605280105522007012600001 | 528 - 01/26/07 (JAX0003605280105522007012600001) | 11/01/59 | Not Selected | |
| HALLMAN,ADAM C | 36 | 528 | | | 07/18/83 | Selected | 3/8/2007 |
| MITCHELL,JEFFREY A | 36 | 528 | JAX0003605280105522007012600001 | 528 - 01/26/07 (JAX0003605280105522007012600001) | 12/29/68 | Selected | 1/28/2007 |
| | | | | | | | |
| GREEN,CEDRIC A | 36 | 528 | JAX0003605280105522008021500001 | 528 - 02/15/08 (JAX0003605280105522008021500001) | 10/08/61 | Selected | 2/17/2008 |
| | | | | | | | |
| DOLLAR,ADAM L | 36 | 531 | JAX0003605310105522007012600001 | 531 - 01/26/07 (JAX0003605310105522007012600001) | 03/02/82 | Not Selected | |
| STALLWORTH,BRITT O | 36 | 531 | JAX0003605310105522007012600001 | 531 - 01/26/07 (JAX0003605310105522007012600001) | 08/23/73 | Selected | 1/26/2007 |
| | | | | | | | |
| SIKES,IMON J | 36 | 531 | JAX0003605310105522008060500001 | 531 - 06/05/08 (JAX0003605310105522008060500001) | 09/18/58 | Not Selected | |
| PARKER,GEORGE THOMAS | 36 | 531 | | | 7/4/1961 | Selected | 7/5/2008 |
| | | | | | | | |
| MOSELEY,RICHARD ALLAN | 36 | 531 | | | 11/17/1965 | Selected | 3/1/2008 |
| | | | | | | | |
| PETTAWAY,DEMETRIA D | 36 | 543 | JAX0003605430105522007012600001 | 543 - 01/26/07 (JAX0003605430105522007012600001) | 01/01/75 | Not Selected | |
| BLACK,ANTHONY E | 36 | 543 | JAX0003605430105522007012600001 | 543 - 01/26/07 (JAX0003605430105522007012600001) | 10/27/57 | Not Selected | |
| | | | | | | | |
| BRADBERRY,CLYDE B | 36 | 543 | JAX3003605430105522007053100001 | 543 - 05/31/07 (JAX3003605430105522007053100001) | 05/25/57 | Not Selected | |
| GODWIN,JASON ROSS | 36 | 543 | | | 1/19/1983 | Selected | 7/26/2007 |

Privileged & Confidential

CONFIDENTIAL

D01137

WINN-DIXIE
FLOW LOG

| FULL NAME | JP_DISTRICT | JP_LOC | JOB_OPENING_ID | STORE/DATE/JOB OPENING ID | DATE OF BIRTH | DISPOSITION | JOB ENTRY DATE |
|---|---|---|---|---|---|---|---|
| JONES,CAREY P | 36 | 553 | JAX0003605530100522007012600001 | 553 - 01/26/07 (JAX0003605530100522007012600001) | 02/12/71 | Not Selected | |
| WATSON,JOHN C | 36 | 553 | JAX0003605530100522007012600001 | 553 - 01/26/07 (JAX0003605530100522007012600001) | 10/15/69 | Not Selected | |
| BROWN,CAROLYN T | 36 | 553 | JAX0003605530100522007012600001 | 553 - 01/26/07 (JAX0003605530100522007012600001) | 01/18/62 | Selected | 1/28/2007 |

Privileged & Confidential

D01138

CONFIDENTIAL